Kenneth ADAMS, et al., Appellants,

v.

Terrel H. BELL, Individually, and as Secretary of the Department of Education, et al.

No. 81–1715.

United States Court of Appeals, District of Columbia Circuit.

Argued 8 Jan. 1982.
Argued En Banc 2 Feb. 1983.
Decided 10 June 1983.

Joseph L. Rauh, Jr., Washington, D.C., with whom John Silard, Elliot C. Lichtman, Washington, D.C., Jack Greenberg, James M. Nabrit, III, Bill Lann Lee and Brent E. Simmons, New York City, were on brief, for appellants.

Michael Jay Singer, Dept. of Justice, with whom Stanley S. Harris, U.S. Atty., and William Kanter, Dept. of Justice, Washington, D.C., were on brief, for appellees.

Before ROBINSON, Chief Judge, WRIGHT, TAMM, MacKINNON, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Dissenting Opinion filed by WRIGHT, Circuit Judge, in which ROBINSON, Chief Judge, WALD and MIKVA, Circuit Judges join as to Parts I, II, III, and V.

WILKEY, Circuit Judge:

Since 1973 the United States District Court of the District of Columbia, in the course of adjudicating the suit *Adams v. Richardson,*[1] has taken an active role in delineating the Department of Education's

---

1. 356 F.Supp. 92 (D.D.C.), *aff'd,* 480 F.2d 1159 (D.C.Cir.1973).

responsibilities in enforcing Title VI of the Civil Rights Act.[2] The present appeal calls upon us to decide whether the district court appropriately declined to enjoin the Department from settling its Title VI enforcement proceeding against the North Carolina higher education system. The district court found that such an order was outside the scope of its prior decrees supervising the enforcement efforts of the Department.[3] We affirm the district court.

## I. BACKGROUND

Title VI of the Civil Rights Act[4] prohibits discrimination by programs receiving federal financial assistance.[5] Title VI directs the federal agencies which grant funds to issue rules to achieve nondiscrimination by recipients and authorizes the federal agencies to terminate grants to recipients which are found after hearing to have failed to comply with these rules.[6] Plaintiffs brought suit in 1970 to compel the Department of Education (then Department of Health, Education and Welfare) to comply with its obligations under Title VI.[7] In 1973 U.S. District Judge Pratt issued a comprehensive order which required the Department of HEW to commence enforcement proceedings against delinquent southern states within 120 days.[8] On appeal, this court modified the order to require the states, in the area of higher education, first to submit plans based on Department of HEW guidelines, with enforcement actions to follow against those states which failed to file or to implement acceptable plans.[9]

The 1973 decree, as modified by this court, provided the basis for continuing litigation before Judge Pratt. In 1977 the district court ordered the Department to revoke its previous acceptance of some desegregation plans, including that submitted by North Carolina in 1974.[10] The court found that the plans failed to meet the requirements set down by the Department and made inadequate progress towards desegregation of higher education.[11] The Department was ordered to promulgate final criteria specifying the ingredients of an "acceptable higher education desegregation plan" and to require the states to submit revised plans which the Department would accept or reject.[12]

In March 1979, after North Carolina's revised plans had been rejected by the Department, the Department initiated enforcement proceedings against the State of North Carolina. In response, North Carolina filed suit against the Department in the U.S. District Court for the Eastern District of North Carolina to enjoin the Department from conducting the administrative hearing and from deferring payment of grants if the hearings were permitted to proceed.[13] North Carolina contended that the enforcement proceeding was unauthorized by Title VI and violated various norms of constitutional and administrative law.[14]

---

**2.** *See Adams v. Weinberger,* 391 F.Supp. 269 (D.D.C.1975) (first supplemental order); *Adams v. Califano,* 430 F.Supp. 118 (D.D.C.1977) (second supplemental order).

**3.** *See infra* p. 164.

**4.** Pub.L. 88–352, Title VI, §§ 601–605, 78 Stat. 252 (1964), *codified at* 42 U.S.C. §§ 2000d–2000d–4 (1976). *See also* 42 U.S.C. §§ 2000d–5 —6 (1976 & Supp. IV 1980).

**5.** 42 U.S.C. § 2000d (1976).

**6.** *Id.* § 2000d–1.

**7.** Plaintiffs are black students, taxpayers and citizens who are wronged by expenditure of federal funds in programs which discriminate against blacks.

**8.** *Adams v. Richardson,* 356 F.Supp. 92 (D.D. C.), *aff'd,* 480 F.2d 1159 (D.C.Cir.1973).

**9.** 480 F.2d at 1165.

**10.** *Adams v. Califano,* 430 F.Supp. 118 (D.D.C. 1977).

**11.** *Id.* at 119–20.

**12.** *Id.* at 121.

**13.** *North Carolina v. Dep't of HEW,* 480 F.Supp. 929 (E.D.N.C.1979).

**14.** *Id.* at 937–38.

The Department moved to transfer the action to the District of Columbia on the grounds that this court was the more appropriate forum for consideration of the legality of the Secretary's actions. The North Carolina U.S. District Court rejected this argument, holding that the District of Columbia court order did not preclude action in other courts to test the legality of specific enforcement measures undertaken by the Secretary.[15] The North Carolina federal court then enjoined HEW deferral of aid during the enforcement proceeding,[16] but declined to reach the merits of North Carolina's challenge to that proceeding. Rather, under the doctrine of primary jurisdiction, the court stayed the suit and retained jurisdiction pending completion of the administrative hearing.[17]

An administrative law judge in the Department of Education then began to hear the Department's evidence on the desegregation of the North Carolina system. At the same time, North Carolina and the Department carried on informal negotiations. Shortly after the Department had completed the presentation of its case in chief, these negotiations culminated in a settlement agreement which was embodied in a consent judgment issued in the North Carolina federal court.[18] That court concluded that implementation of the terms of the settlement would bring the North Carolina higher education system into compliance with Title VI.[19] The consent decree was the final judgment in North Carolina's suit against the Department, and its provisions terminated the administrative proceeding against North Carolina.[20]

Although appellants were limited intervenors in the administrative proceeding,[21] they did not seek at any time to intervene in the suit before the North Carolina federal court and therefore had no standing to appeal the consent judgment.[22] Instead, appellants sought to prevent entry of the decree by requesting that the District of Columbia federal court, before which they were plaintiffs, enjoin the Department of Education from acceding to the proposed settlement.[23] U.S. District Judge Pratt ruled, however, that supervision of this Department decision was beyond the scope of his initial decree.[24] This appeal ensued.

15. *Id.* at 932–34.

16. *Id.* at 938–40.

17. *Id.* at 937–38 & 940 n. 8.

18. *North Carolina v. Dep't of Educ.*, Mem. op., No. 79–217–CIV–5 (E.D.N.C. 17 July 1981).

19. *Id.* at 3–8.

20. *Id.* at 1–2.

21. *In the Matter of the State of North Carolina and the Board of Governors of the University of North Carolina*, E.D. Docket No. 79–IV–1 and HUD Docket No. 79–4 (Order of 13 Aug. 1979).

22. *North Carolina v. Dep't of Educ.*, Mem. op. at 2 n. 1. *See infra* pp. 168–170 and note 39.

23. Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction, Civil Action No. 70–3095 (25 June 1981).

24. *Adams v. Bell*, Transcript at 26–30, Civil Action No. 70–3095 (25 June 1981). Judge Pratt concluded that the exercise of its power under the decree was "directed primarily at the agency and not at the individual states and school districts with which the agency has to deal," *i.e.*, this power was "directed against the agency to see that the agency complied with its statutory [and] constitutional responsibilities. It was not directed ... at the individuals that are the subject of any action that the agency might see fit to take." *Id.* at 29–30.

The 1973 decree which Judge Pratt interprets here had ordered the Department to *initiate* enforcement proceedings. *See, e.g., Adams v. Richardson*, 356 F.Supp. at 94 ("Having once determined that a state system of higher education is in violation of Title VI, and having failed during a substantial period of time to achieve voluntary compliance, defendants have a duty to commence enforcement proceedings ... [d]efendants, their successors, agents and employees, are required and enjoined within 120 days from the date of this Order to commence enforcement proceedings by administrative notice of hearing, or to utilize any other means authorized by law, in order to effect compliance with Title VI by the states ...."). *See also infra* note 25, 30.

We wrote on review that the purpose of the 1973 decree was not to "resolve particular questions of compliance and noncompliance." 480 F.2d at 1163. Our opinion continued:

Far from dictating the final result with regard to any of these districts, the order merely

## II. ANALYSIS

■ Judge Pratt correctly interpreted the initial decree not to extend to supervision of the Department's settlement of its enforcement action against North Carolina. While we do not pass on the scope of the district court's authority with reference to other possible Department of Education actions,[25] we affirm Judge Pratt's ruling that the injunction requested in this case would be inappropriate in light of the scope of his initial decree.

The purpose of Judge Pratt's 1973 decree was to require the Department to initiate appropriate enforcement proceedings under Title VI. It was directed at the Department's lassitude, if not recalcitrance, in fulfilling its responsibilities under that Act.[26] However, Judge Pratt's 1973 decree, as affirmed with modifications by this court and as supplemented by him in 1977, did not purport to supervise or dictate the details of the Department's enforcement program, once that program culminated in an admin-

istrative proceeding, itself subject to judicial review, against a recipient state.

Judge Pratt's remedial decrees have been carefully crafted to embody this limitation. When the court ordered the Department to enforce the statute in 1973, it did not purport to dictate a fixed formula for choosing among these modes of implementation; *i.e.*, it did not dictate specific compliance criteria but left the choice among lawful criteria to the discretion of the Department and of the states.[27] Similarly, the particular terms of the amended criteria issued by the Department pursuant to the 1977 District of Columbia District Court order were never endorsed or compelled by the district court,[28] and indeed have been subsequently revoked by the Department.[29] Thus, the point of his various district court orders, as Judge Pratt explained, was not to specify what the final results of enforcement would be in every detail, nor to decree unalterable requirements for compliance with Title VI, but rather to have the Department initiate the process of enforcement, the process by

requires initiation of a process which, excepting contemptuous conduct, will then pass beyond the District Court's continuing control and supervision. The school districts must be notified of the purpose to terminate and be given a hearing. 45 C.F.R. § 80.8(c). At the hearing conducted by a hearing examiner, the district enjoys the usual protections of an adjudicatory proceeding, including the right to counsel, the right to introduce all relevant evidence, and the right to cross-examine witnesses. The examiner's decision can be appealed to a reviewing authority, then to the Secretary, and finally to the courts. 45 C.F.R. §§ 80.10, 80.11; 42 U.S.C. § 2000d–2. 28 U.S.C. § 1391 gives the school districts and states petitioning for such judicial review a choice of venue, including the judicial district in which the plaintiff resides.

**25.** Since the decision affirmed here, the district court has entered two additional orders. On 10 March 1983 the court set deadlines for agency investigation of discrimination complaints, for attempts to achieve voluntary compliance and for initiation of enforcement proceedings. *See Adams v. Bell*, 51 U.S.L.W. 2560 (10 March 1983) (summary of order). On 24 March 1983 the district court ordered the Department to commence enforcement proceedings against

certain states, while allowing to stand the Department's acceptance of other states' desegregation plans.

**26.** *See supra* note 24 (quoting 1973 decree).

**27.** Hence the details of the initial decree are limited to monitoring steps taken by the Department to initiate administrative hearings and do not extend to the substance of the Department's enforcement policy. *See* 356 F.Supp. at 94–95. Similarly, the court's most recent decrees address the Department's responsibility to initiate enforcement proceedings, not the Department's subsequent conduct of these proceedings. *See supra* note 25. This court, modifying and affirming the district court decision, also articulated these bounds upon the scope of the district court's decree. *See Adams v. Richardson*, 480 F.2d at 1163–64 & n. 5. (As to the content of the second supplemental decree, *see infra* note 30.)

**28.** *See Adams v. Califano*, 430 F.Supp. at 121 (order); Amended Criteria Specifying Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education, 42 Fed. Reg. 40780 (11 Aug. 1977).

**29.** *See* Revised Criteria, 43 Fed.Reg. 6658 (15 Feb. 1978).

which the specifics of compliance would then be determined.[30]

■ The district court orders were a rational means of assuring Department compliance with Title VI without an undue exercise of judicial control over the Department. Given the sweeping language of Title VI and the complexity of the educational systems to which it applies, the Department and the states have available to them many ways of implementing Title VI's goals of preventing discrimination in federally aided education. An enforcement proceeding or voluntary settlement may culminate in any one of these possible approaches to compliance; Title VI, as interpreted by Judge Pratt's decrees of 1973 and 1977, in the first instance gives responsibility to the agency and not the courts to choose among possible means of compliance. Hence, these decrees correct systemic defalcation on the part of the Department in fulfilling that responsibility, but do not, as we held in *Adams v. Richardson*, "resolve particular questions of compliance and noncompliance." [31]

Were the district court to read its initial decree to contemplate the relief plaintiffs now seek, that court would encroach upon the role of the institutions responsible for implementing Title VI and constitute this court as *perpetual supervisor* of the enforcement actions of the Department and of the desegregation policies of the states. Moreover, were the district court to interpret its prior decrees to embody its conception of a *specific plan* for compliance with Title VI, such an interpretation would effectively reverse the normal relations between agency and court. Normally the court reviews the decisions of the agency rather than the agency simply obeying prior directives of the courts: a court issues directives governing the agency's future course of conduct only in the course of reviewing some final administrative action. Thus Judge Pratt's decrees of 1973 and 1977 reviewed the agency's prior policy of neglect in initiating enforcement proceedings and corrected this policy by decrees directing the initiation of enforcement. But Judge Pratt did not further purport in these decrees to specify *in advance* particularized determinations of policy to be adopted by the Department in the course of enforcement proceedings. The District Judge correctly saw no justification for such an extension of the court's domain. Rather, the form of compliance with the norms of desegregation is to be determined in the course of an ongoing enforcement proceeding against an individual state.[32]

30. Of course, the court scrutinized specific plans for compliance when it ordered revocation of the department's acceptance of those plans in 1977. But this order was premised upon failure of the plans to satisfy the Department's *own* desegregation criteria—criteria which had never been passed upon by the district court. More importantly, the decision which provided the ground for the court's scrutiny of specific plans—*i.e.*, Department acceptance of those plans—preceded any enforcement action. The court's action in this respect differs significantly, for reasons spelled out further *infra* pp. 167–170, from court scrutiny of desegregation plans accepted after initiation of administrative proceedings which culminate in a court order.

In other words, we agree with the district court that, for the reasons set out at pp. 166–167, the decision made by the Department to compromise an ongoing enforcement proceeding is not at that stage an action subject to judicial review under 42 U.S.C. § 2000d–2, at least not within the terms of the governing *Adams* decree. Rather, that proceeding, whether culminating in a decision by the ad-

ministrative law judge or in a settlement, itself terminates in an action which provides the predicate for judicial review in the appropriate district court. *See infra* pp. 168–170.

31. 480 F.2d at 1163. *See supra* note 24.

32. This is clearly articulated both by Title VI, *see* 42 U.S.C. §§ 2000d–1, –2, and by our opinion in *Adams, see supra* note 31. It should also be noted that the enforcement process naturally contemplates settlements such as that reached in the present case. We explained in *Adams:* "As judges well know, the setting down of a case for hearing does not automatically terminate voluntary negotiations nor eliminate the possibility of agreement. The need to prepare for actual hearing frequently causes litigants to focus on their weaknesses as well as their desires." 480 F.2d at 1165. *See also* 42 U.S.C. § 2000d–1 (policy of Title VI to encourage voluntary compliance). Extending the *Adams* decree to *the Department's* decisions to settle, in contrast to permitting challenges to the settlement later in an appropriate district

Finally, appellants' argument would have the effect of *centralizing* judicial control of Title VI implementation in the District of Columbia district court. But, as the Supreme Court has recognized, "[i]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home."[33] Moreover, geographic dispersion of cases is one way to avoid excessive concentration of judicial power in a single tribunal. The district court decrees in this case reflect sensitivity to these principles.[34] Under the limitation on its decrees established by the district court, state school systems who wish to challenge specific Department action with regard to their localities may choose to bring suit in the federal courts in their states. In contrast, the result of appellants' argument would be to vest in the federal courts of the District of Columbia plenary power to approve or disapprove the Department's Title VI decisions. We should hesitate to arrogate such power to ourselves.

If the limitation Judge Pratt recognized upon the scope of his authority enabled state instrumentalities to continue receipt of federal funding without judicial review, we would hesitate to accede to the decision below. In fact, however, such review is always available. The primary mechanism is a Title VI suit against the state itself. When such a suit is successful, failure of the Department to terminate funds would be an abuse of discretion, and would also evidence continuation of a general policy of non-enforcement violative of the district court's earlier decree. The point is, however, that direct relief *under that decree* is limited to situations which indicate persistence by the Department in the conduct that prompted it—namely, that the Department "has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty."[35]

court, would impede such voluntary settlements. Indeed, we note that permitting challenges to continued funding while compliance negotiations were in progress, though justified in the *Adams* situation of conscious Department under- or non-enforcement, might in other situations be an undesirable distraction to Department attempts at obtaining voluntary compliance, although we of course do not reach this more general question in deciding the present case.

**33.** *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). We have also suggested that it is desirable to try cases concerning primarily local issues in the affected localities. *See Liquor Salesmen's Union Local 2 v. N.L.R.B.,* 664 F.2d 1200, 1205 (D.C.Cir.1981).

**34.** Under the common law, trial in the vicinage was an ancient and respected right. *See generally* Blume, *Place of Trial in Civil Cases,* 48 Mich.L.Rev. 1 (1949). Originally, this right was established to facilitate trial by a jury with first-hand knowledge of the transactions at issue. As trial procedures evolved towards present-day practices, the right of venue came to serve the roles of protecting defendants from the inconvenience and harassment of participating in trial far from home, and of assuring an appropriate distribution of cases among different tribunals. Venue policies thus limit plaintiffs' control over the litigation they initiate by limiting the courts to which they have access. In complex suits such as the present litigation, these policies must protect not only the interests of the technical defendants—here the Department of Education—but, more importantly, those whose rights and interests are in fact most vitally affected by the suit—the people of North Carolina. As the common law doctrine recognized, trial in the locality of the policies or transactions at issue is one way to respect those interests; and it serves to further public participation in and the accountability of a judicial process that will result in decisions directly and vitally affecting large numbers of citizens. The litigation of judicially-mandated desegregation—which has universally proceeded in the districts where the desegregation decrees are to be implemented—illustrates the same concern.

Of course, we do not suggest that the district court below would not in a formal sense meet the prerequisites of jurisdiction and venue for hearing plaintiffs' case (except perhaps the requirement of jurisdiction to hear a suit against North Carolina, *see infra* p. 170). Instead, as noted in text, these principles correctly informed Judge Pratt's interpretation of the decrees at issue in this case.

**35.** *See Adams v. Richardson,* 480 F.2d at 1162. The evolving law under Title VI has provided a dual enforcement mechanism, comprising pri-

We have no occasion in the context of the present case to speculate what Department decisions rise to the level of a general policy of abdication; or what particularized determinations, short of the failure to cut off funds to an instrumentality finally adjudged to be in violation of Title VI, constitute such clear evidence of a continuing policy of nonenforcement as to support invocation of our earlier decree. Suffice it to say that the Department's commencement of an enforcement action that is later settled through a compliance agreement approved by an appropriate district court does not qualify.

Moreover, after an administrative hearing is initiated, judicial consideration of the particular compliance decisions of the Department and the states may generally proceed by normal processes of judicial review. For example, if the administrative proceedings against North Carolina had culminated in a decision issued by the administrative law judge and adopted by the Department, the state or appellants here (intervenors in the administrative proceeding) would have been free to seek judicial review in federal court.[36]

 The normal course of judicial review was similarly available for appellants in the context of the enforcement proceeding in question here. Because they assert claims which raise issues of law and fact common to the claims asserted by North Carolina in its suit against the Department, appellants could have sought to intervene in that suit;[37] indeed, they may have had a

vate suits brought directly against offending instrumentalities and administrative proceedings for termination of funding as prescribed by 42 U.S.C. § 2000d–1. *See generally Cannon v. University of Chicago,* 441 U.S. 677, 704–09, 99 S.Ct. 1946, 1961–1964, 60 L.Ed.2d 560 (1979) (discussing Title VI as "model" for Title IX). For examples of private suits against grant recipients to enforce Title VI, see *Uzzell v. Friday,* 547 F.2d 801, aff'd en banc, 558 F.2d 727 (4th Cir.), *vacated on other grounds,* 438 U.S. 912, 98 S.Ct. 3139, 57 L.Ed.2d 1158 (1977); *Gilliam v. Omaha,* 524 F.2d 1013 (8th Cir.1975); *Serna v. Portales Municipal Schools,* 499 F.2d 1147 (10th Cir.1974); *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir.1973). The Supreme Court has described private suits as an "important and especially flexible part" of the procedures for enforcing Title VI. *Cannon,* 441 U.S. at 706 n. 40, 99 S.Ct. at 1962 n. 40. In contrast, the Court notes that Congress had described the fund cutoff remedy as a "last resort": "In most cases alternative remedies, principally lawsuits to end discrimination, would be the preferable and more effective remedy." *Id.* at 705 n. 38, 99 S.Ct. at 1962 n. 38 (quoting legislative history); *see also id.* at 712 n. 49, 99 S.Ct. at 1965 n. 49. As the Court observed, one advantage of private actions as a means of judicial consideration of compliance with Title VI is that such actions are consistent with the Department's fulfillment of its own responsibilities under Title VI, particularly where the aggrieved party complains of Department inaction. "[A] suit to compel the agency to investigate and cut off funds [citing *Adams v. Richardson* ] . . . is far more disruptive of [the Department's] efforts efficiently to allocate its enforcement resources under Title IX than a private suit against the recipient of federal aid could ever be." *Id.* at 707, 99 S.Ct.

at 1963. As the Court's citation of *Adams* suggests, Title VI and Title IX are analogous in this respect. *Id.* Clearly, private suits provide an appropriate and effective mechanism for judicial consideration of compliance with Title VI.

Of course, administrative proceedings for fund cutoffs provide an important means for enforcing Title VI. But such proceedings will be less frequently the occasion for judicial scrutiny of compliance by federally funded programs, because judicial review will be available only after a Federal "department or agency action." 42 U.S.C. 2000d–2. Such action may include the "conscious[ ] and express[ ] adopt[ion] of a general policy" of nonenforcement, the action which provides the predicate for the decrees in the *Adams* litigation. 480 F.2d at 1162. But, as we have stated, *see supra* pp. 166–167, the statutory requirement of administrative action to be followed by judicial review places responsibility for determination of the form of compliance, in the first instance, with the Department and the states, not with the courts.

36. *See* 42 U.S.C. § 2000d–2 ("Any department or agency action taken pursuant to section 2000d–1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.") Plaintiffs would arguably be persons "adversely affected or aggrieved by agency action within the meaning of" Title VI and therefore entitled to seek judicial review. 5 U.S.C. § 702 (1976).

37. *See F.R.Civ.P.* 24(b) (Permissive Intervention). It is noteworthy in this regard that, upon appellants' application, the North Carolina fed-

right to intervene, because they claim "an interest relating to the ... transaction which is the subject of the action and [are] so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest ...." [38] Had appellants intervened in the North Carolina U.S. District Court proceeding, they could have taken an appeal to the Fourth Circuit Court of Appeals and then petitioned the United States Supreme Court.[39] In short, appellants had ample opportunity to assert their rights through the normal routes of judicial review. The district court therefore correctly declined to exercise extraordinary supervisory power over the Department to further appellants' interests: These interests could have been

---

eral court did consider *amicus* briefs they submitted. *See North Carolina v. Dep't of Educ.,* Mem. op. at 2 n. 1.

**38.** *Id.* 24(a) (Intervention of Right). In similar situations, some courts have denied intervention because the government is thought adequately to represent the putative intervenor's claims. *See, e.g., U.S. v. South Bend Community School Corp.,* 511 F.Supp. 1352, 1357 (D.C. Ind.1981); *U.S. v. Carroll County Bd. of Educ.,* 427 F.2d 141 (5th Cir.1970). However, the cases indicate that the right to intervene may be enjoyed by putative intervenors who assert interests adverse to the government or who claim that the governmental party has been derelict in fulfilling its duties—which are precisely appellants' claims in the present case. *See Trbovich v. United Mine Workers of America,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); *Hanson v. Hobson,* 408 F.2d 175 (D.C. Cir.1969); *U.S. v. School of Omaha,* 367 F.Supp. 198 (D.C.Neb.1973); *U.S. v. Bd. of Educ. of Chicago,* 88 F.R.D. 679, 686 (D.C.Ill. 1981). In any event, the more critical point is that appellants did not even seek to intervene in the North Carolina proceedings, an omission which colors an equity court's consideration of the propriety of the extraordinary relief they now seek.

**39.** It is well settled that an intervenor may appeal from subsequent orders in an action. *See, e.g., Cerro Metal Prods. v. Marshall,* 620 F.2d 964, 969 (3d Cir.1980); *In the Matter of First Colonial Corp. of Amer.,* 544 F.2d 1291 (5th Cir.), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946). (Indeed, intervention may be granted solely to enable the intervenor to appeal, *see, e.g., Smuck v. Hobson,* 408 F.2d 175 (D.C.Cir.1969).) Conversely, one who does not seek to intervene may not appeal a subsequent order, *see, e.g., Brotherhood of Railroad Trainmen v. Baltimore & O.R. Co.,* 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947).

We are puzzled by the suggestion that it was the responsibility of the North Carolina federal district court and of the parties before it to join the *Adams* plaintiffs in the litigation before that court. *See* Judge Wright's Dissenting Op. at 196–197. When that litigation was pending, *none* of the *Adams* plaintiffs were citizens of North Carolina. North Carolina citizens were joined to the *Adams* suit, by appellants' motion to add new parties plaintiff, only in November 1982, a year after entry of the consent judgment by the North Carolina district court. Thus, when the proposed consent decree was before the North Carolina federal district court, the *Adams* plaintiffs were not persons "subject to service of process" by that court and therefore could not meet the elementary requirement for joinder set out by the opening words of Rule 19(a). If appellants—who of course now include citizens of North Carolina—wished to assert some interest in the administrative proceeding and in the review of that proceeding by the North Carolina federal district court, it was incumbent upon them to intervene.

In any case, whatever the responsibility of the North Carolina parties to join the *Adams* plaintiffs in order to obtain collateral estoppel effect for the North Carolina federal district court judgment, this responsibility bears no relation to our present holding. We do not consider that relief under the *Adams* decrees is barred because of findings on any particular issues by the North Carolina federal district court. Moreover, given the timing of appellants' suit, it would indeed be odd to consider collateral estoppel relevant to the initial action in the U.S. District Court of the District of Columbia. The *Adams* plaintiffs sought to enjoin the Department's action *prior* to entry of the North Carolina consent judgment; their action could of course not be barred by a judgment which had not yet issued. In short, we have no occasion to give collateral estoppel effect to the North Carolina judgment; nor do we hold that plaintiffs' failure to intervene in the North Carolina district court proceedings foreclosed relief otherwise available in the district court below. *Compare* Dissenting Opinion of Judge Wright at 194–196. Rather, our observation that appellants could have intervened in the North Carolina federal district court proceedings emphasizes that the interpretation of the *Adams* decrees by U.S. District Judge Pratt does not foreclose appellants from seeking judicial consideration of the Department's actions: such consideration was fully available through normal procedures for judicial review.

fully protected by intervention in a pending lawsuit which provided an appropriate forum for consideration of appellants' claims.[40]

Our holding that appellants' failure to intervene in the North Carolina suit undermines their claims before us derives from more than merely an overscrupulous regard for the niceties of appellate procedure. This failure has severe practical consequences in the present case. Because the consent decree has been entered, appellants must now request that this court order the Department to continue the enforcement proceeding against North Carolina and to petition the North Carolina U.S. District Court for relief from its obligations under the consent decree. Such an order by this court would disturb the fundamental balance our rules of procedure strike, not only between courts and executive agencies, but also among the powers of coordinate federal tribunals and the rights of parties who are or ought to be before those tribunals.

Because they declined to present their claims before the federal court in North Carolina, appellants now find themselves in the position of asking the District of Columbia federal courts to disregard a *judgment* of the North Carolina federal court. This posture of the case has several consequences. Initially, because the consent decree establishes rights which North Carolina is entitled to protect against subsequent judicial interference, effective relief by the district court here requires that North Carolina be a party before it. Any effective relief granted by this court would be in derogation of North Carolina's rights as established by the consent decree in a U.S. District Court outside this circuit.

In this respect the relief sought by appellants places them in a dilemma. Under the doctrine of standing, article III is held to require plaintiffs to allege an "actual injury" and one "likely to be redressed by a favorable decision." [41] So, if on the one hand, a court order compelling the Department to withdraw from the consent judgment called for only a gesture, a *pro forma* motion by the Department, this would neither provide relief substantial enough nor evidence enough of any real injury which was being redressed to satisfy the "case or controversy" requirement. The government would simply ask the North Carolina federal court to reconsider its decision as to whether the terms of the consent judgment were "fair and adequate"; that court would endorse the agreement once again; and the government would remain bound.

On the other hand, an order from this court that the government use all efforts to withdraw from the settlement agreement might have greater effect, if it were somehow to influence the North Carolina federal court's reevaluation of the merits of its own

---

**40.** As the North Carolina district court recognized, a court should enter a consent decree affecting the public interest only after considering the substantive validity of the decree. *North Carolina v. Dep't of Educ.,* Mem. op. at 2 (E.D.N.C. 17 July 1981). *See U.S. v. Miami,* 614 F.2d 1322, 1330–31 (5th Cir.1980).

Of course, nothing in the present opinion reflects upon the power of the district court in the District of Columbia to supervise the policy of the Department with regard to whether it will initiate enforcement proceedings against school systems. As noted above, this is the gravamen of the court's initial decree. *See supra* pp. 165–166. The court exercised this power in 1977, for example, when it ordered the Department to revoke its acceptance of plans submitted by the individual states which perpetuated past illegal discrimination. *Adams v. Califano,* 430 F.Supp. at 119–21; *see supra* note 30. We of course do not pass upon the question whether the court may have occa-

sion to exercise this power again with reference to plans accepted by the Department after negotiation. Rather, once the processes of administrative enforcement and subsequent judicial review are set in motion, the role of the district court's enforcement orders comes to an end.

**41.** *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 38, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). *See also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258, 261–63 (D.C.Cir.1980). The court cannot exercise its article III jurisdiction if the injunction sought by appellants would do nothing to remedy the injury which brings them into court—*i.e.,* the granting of federal funds to a system allegedly in violation of Title VI.

prior decision. But insofar as this is the case, the judgment of this court will have substantially undermined the rights of North Carolina as secured by the consent judgment. North Carolina then becomes a party "needed for just adjudication," and arguably indispensable to the proceeding here under the terms of Rule 19(b).[42]

In short, the only effectual relief from the U.S. District Court consent judgment is relief which undermines the rights of North Carolina and thus requires that the state be before a federal court in the District of Columbia—which it is not. The more clearly a "case or controversy" is defined, the more meaningful the relief sought, the more certainly North Carolina is an indispensable party.

Moreover, the relief now requested by appellants would place the Secretary of Education in the position of disobeying either U.S. District Judge Pratt's order or the order of U.S. District Judge Dupree in North Carolina. Appellants ask us to order the government's agents to do everything within their power to repudiate or disrupt the North Carolina consent judgment and then to hold those agents in contempt if they fail in doing so. Such relief would create an unseemly, indeed an intolerable, situation.[43]

We thus hold that, in the circumstances of this case, Judge Pratt correctly interpreted his prior decrees not to apply to the Department's actions in the present case. For these reasons, the judgment of the district court is

*Affirmed.*

J. SKELLY WRIGHT, Circuit Judge, with whom Chief Judge SPOTTSWOOD W. ROBINSON, III, and Circuit Judges WALD and MIKVA concur as to Parts I, II, III, and V, dissenting:

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | BACKGROUND | 174 |
| II. | TITLE VI AND THE *Adams* ORDERS | 180 |
| | A. Title VI Enforcement Scheme | 181 |

**42.** *F.R.Civ.P.* 19(b). Of course, it is our responsibility to protect the rights of absent parties under Rule 19, even when the district court had no occasion to do so. *See Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 110–11, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968). In particular, the rule requires the court to consider four factors in determining whether to dismiss an action on the ground that a person not before the court is an indispensable party:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Under the first and second prongs of this test, when the relief requested *must,* to satisfy plaintiffs' claims, be in derogation of the rights of a person not before the court, that person is an indispensable party. In the present case, the essence of plaintiffs' claims is, of course, that the North Carolina higher education system should not receive federal funds because of the anti-discrimination provisions of Title VI; it is therefore inherently prejudicial to the entitlement established by the North Carolina federal court—the determination that the North Carolina higher education system is in compliance with Title VI, so that those provisions do not bar the grant of any aid otherwise available to the system. Moreover, applying the fourth prong of the test under Rule 19(b), we note, without passing on the question of the remedies which appellants may now pursue, that at the time of the decision under review, appellants could have asserted their claims by intervening in the suit before the North Carolina district court. *See supra* pp. 168–170.

Judge Wright's dissent suggests that North Carolina may have "waived" the protections of Rule 19 by failing to join the *Adams* plaintiffs as parties before the North Carolina federal district court. But, as we have already noted, that court had no personal jurisdiction over these plaintiffs at the time it approved the consent decree. *See supra* note 39. North Carolina hardly "waived" its rights by not asking the North Carolina federal district court to do something that court had no power to do.

**43.** As we have explained, *see supra* note 39, we have no occasion to give collateral estoppel effect to the judgment of the North Carolina federal district court. Nor does our affirmance of the decision of the district court here, dismissing this suit, carry any implication for the question of whether the Department has complied with its statutory and constitutional responsibilities. Like District Judge Pratt, we simply do not reach this issue.

TABLE OF CONTENTS

Page

B. The *Adams* Orders ----------------- 183

 1. *En banc* decision ---------------- 183

 2. District Court decrees ----------- 184

C. Requesting Relief Under This Scheme -- 186

III. THE COURT'S VISION OF THE ENFORCEMENT SCHEME ------------------------------ 188

A. Title VI Suit Against Fund Recipient -- 188

B. Justifying This Alternative Vision ----- 191

 1. Decentralizing judicial administration of Title VI ---------------- 191

 2. Procedural balance among courts and parties -------------------- 194

 a. Mandatory intervention ------ 194

 b. Indispensable parties --------- 198

 3. Recognizing North Carolina court's judgment --------------------- 200

C. Mootness on Appeal ----------------- 203

IV. THE DEPARTMENT HAS NOT FULFILLED ITS LEGAL OBLIGATIONS --------------------- 204

A. Abandonment of Desegregation Criteria ------------------------------ 204

B. Failure to Correct Deficiencies of the Prior Plan ----------------------- 207

 1. Desegregation of student bodies --- 207

 2. Desegregation of faculties -------- 208

 3. Reduction of program duplication -- 208

 4. Enhancement of black institutions -- 209

V. CONCLUSION -------------------------- 209

In Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1976 & Supp. V 1981), Congress adopted a federal

statutory solution to the century-old problems of segregation and racial discrimination in institutions of higher education. Section 601 of the Act declares that "[n]o person in the United States shall, on the ground of race, color, or national origin, * * * be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Section 602 then imposes upon each federal agency empowered to extend federal aid a "mandatory duty * * * to utilize the funds * * * to enforce civil rights requirements," H.R.Rep. No. 914, 88th Cong., 1st Sess., Pt. 1 at 76 (1963), U.S.Code Cong. & Admin. News 1964, pp. 2355, 2391, and requires these agencies to terminate the flow of funds to recipients found in violation of the Act.[1] 42 U.S.C. § 2000d–1. Congress originally assigned to the Department of Health, Education and Welfare (HEW) the task of effectuating Title VI with respect to institutions of higher education, and later transferred this "mandatory duty" to the Department of Education (DE).[2]

Beginning in 1970 appellants, the *Adams* plaintiffs,[3] brought a series of suits under Section 603 of the Act, 42 U.S.C. § 2000d–2, to force HEW to carry out its mandatory duty under Section 602 to enforce the nondiscrimination provisions with respect to the institutions of higher education in ten Southern states.[4] On at least three occasions—twice in the District Court of this circuit[5] (hereafter the District Court) and

---

1. Title VI states that each federal agency empowered to extend federal aid is both "authorized and directed" to effectuate the law with respect to the particular programs it administers. 42 U.S.C. § 2000d–1 (1976). As originally proposed by the Administration, Title VI would simply have granted each agency discretion to withhold federal funds from public agencies that discriminated. House Doc. 124, 88th Cong., 1st Sess., Message from the President of the United States Relative to Civil Rights at 24 (June 19, 1963). However, the House Judiciary Committee proposed a bill, similar to the one ultimately enacted, that declared unequivocal rights and made the agency's vindication of those rights mandatory. *See* H.R.Rep. No. 914, 88th Cong., 1st Sess., Pt. 1 at 76 (1964).

2. Congress transferred the responsibility for enforcing Title VI in the field of higher educa-

tion to the Secretary of Education in 1979. *See* 20 U.S.C. § 3401 *et seq.* (Supp. V 1981).

3. Plaintiffs-appellants are certain black students, citizens, and taxpayers of 11 states, including North Carolina.

4. This action was originally brought against the Secretary of Health, Education and Welfare (HEW). But the current defendants are Secretary of Education Terrel H. Bell and the director of the Office of Civil Rights of the Department of Education. *See* note 2 *supra* (explaining that responsibility for Title VI enforcement was transferred to Secretary of Education).

5. *Adams v. Richardson,* 351 F.Supp. 636 (D.D. C.1972) (Memorandum Opinion); 356 F.Supp. 92 (D.D.C.1972) (Declaratory Judgment and Injunction Order); *Adams v. Califano,* 430

once in this court[6]—appellants' efforts were vindicated: The courts of this circuit issued orders requiring HEW to carry out its Section 602 duties and thereby to implement the mandate to end racial discrimination that is stated in Section 601. However, on June 25, 1981, when the *Adams* plaintiffs returned to the District Court—this time seeking to enjoin the Secretary of Education (Secretary) from entering into an allegedly unlawful agreement with the State of North Carolina—the District Court found itself without the statutory authority to grant the requested relief.[7] This court now affirms on the theory that the relief requested was outside the scope of the prior orders of the courts of this circuit. Maj. op. at 163. In so holding the court necessarily rules that Section 603 does not authorize judicial review of a final Department compliance decision once the agency has initiated an enforcement proceeding against a particular state.[8] *See* maj. op. at 165, 166 n. 30, 166–167 n. 32, 168.

I respectfully dissent. In my judgment, the line the court draws between agency action that is and is not subject to direct judicial review under Section 603 is contrary to the plain language of the statute and antithetical to our entire jurisprudence of administrative law. Section 603 of the Civil Rights Act unambiguously provides aggrieved persons with a right to challenge "[a]ny [D]epartment or agency action," including the Department's final decision to continue funding a system of higher education that allegedly discriminates on the basis of race. Section 602 requires the Department to enforce the nondiscrimination provision of the statute, and Section 603 authorizes aggrieved persons directly to obtain review of Department action taken pursuant to that statutory mandate. The court orders previously issued in this litigation were, of necessity, based on Section 603, and hence I believe that appellants' request for relief easily fell within the scope of those orders. But even if no prior orders had ever issued, appellants would have a separate and enforceable right under Section 603 to obtain relief against allegedly arbitrary and capricious Department action in the venue of their choice. Final Department action is always subject to judicial review, unless explicitly precluded by statute or committed to agency discretion by law. 5 U.S.C. §§ 701–706 (1976). Section 603 obviously does neither.

In light of the enforcement scheme Congress created in Sections 602 and 603, I would remand this case to the District Court. I would instruct it to determine whether the Department has followed its own rules and regulations in assessing the compliance of the State of North Carolina with the Act, and, should it find that the Department ignored its own criteria for what constitutes an acceptable desegregation plan, to order the Department to resume the administrative hearing process that is condition precedent to a termination of funds. The District Court's role in this litigation, as in any other case where it reviews final administrative action, is to review Department resolutions of fund recipients' compliance, not to resolve these questions itself or to order a termination of funds.

F.Supp. 118 (D.D.C.1977) (Second Supplemental Order).

6. *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir. 1973) (*en banc*) (*per curiam*).

7. *Adams v. Bell,* D.D.C. Civil Action No. 70–3095 (June 25, 1981), Appendix for Plaintiffs-Appellants (App.) at 30.

8. Dismissal, without an examination of the merits, is inappropriate if there is *any* legal theory upon which relief can be based. *See* notes 89–91 *infra.* Appellants' motion for further relief invoked § 603 via six separate stat-

utes—including the APA—and dismissal is inappropriate if any of them state a cause upon which relief can be granted. *See* notes 86–88 *infra* and accompanying text; *see also* notes 53, 54 *infra.* When the majority dismisses without examining the merits, it necessarily holds that § 603, via these six statutes, does not state a cause upon which relief can be based. The majority's holding that the relief requested falls outside the scope of the prior orders thus includes a finding that these prior decrees established the outermost limits of § 603's authorization for judicial review.

In Part I of this dissent I detail appellants' diligent efforts over the past thirteen years to force the Department to carry out its mandatory Section 602 duties. Part II then outlines the scheme Congress created in Sections 602 and 603 for enforcing the nondiscrimination proscription and explains how the prior orders of the courts of this circuit fit within that scheme. Part III argues that the majority's opinion substitutes its own vision of an ideal enforcement scheme for the one which Title VI and our rules of civil procedure jointly create. More specifically, I will show: that suits against the Department, not the fund recipient, are the primary mechanism Title VI creates for obtaining judicial review; that the venue laws give plaintiffs their choice of forum for bringing such lawsuits; and that no principle of procedure or equity supports the majority's effort to affirm the District Court's forfeiture of its statutory

authority to review challenges to final Department action. Finally, Part IV demonstrates that, were the District Court to evaluate the merits of this case, it would find, as the United States Commission on Civil Rights has already found,[9] that the Department arbitrarily and capriciously abandoned its own criteria for an adequate desegregation plan when it accepted the North Carolina settlement. The Department has thus abdicated its duty to enforce the law and the District Court should take all steps necessary to ensure that it does not do so again in the future.

## I. BACKGROUND

Congress passed Title VI in 1964 to prohibit racial and ethnic discrimination in education programs financed with federal funds.[10] But it was not until January 1969

---

9. On July 10, 1981 the United States Commission on Civil Rights urged the Secretary of Education to reconsider his decision to accept the North Carolina plan. Chairman Flemming of the Commission, writing for the full body, gave the Commission's reasons as follows:

 "... We have concluded that this agreement fails to incorporate the major requirements of the court-mandated higher education desegregation criteria with regard to strengthening the traditionally black institutions, desegregation of student enrollments, and desegregation of faculty and administrative staff. The agreement offers less than the 1979 plan which was rejected by HEW and is similar in scope to the 1974 plan which the *Adams* court found to be inadequate. Additionally, the major issue preventing approval of the 1979 plan—the elimination of program duplication among black and white institutions serving the same geographic areas—is not addressed in the agreement."

 The Commission then went on to express its concern that "... by submitting the agreement as a consent decree in the U.S. District Court for the Eastern District of North Carolina instead of as a desegregation plan subject to the *Adams* criteria and review by the U.S. District Court for the District of Columbia, the Department of Education and North Carolina, in effect, may avoid scrutiny by the *Adams* court. *The consent decree approach sets a Departmental precedent as a way to circumvent the Title VI administrative compliance procedures and the court-ordered desegregation requirements.*"

 Brief of plaintiffs-appellants at 12 (*quoting* report of Commission on Civil Rights) (emphasis added).

10. Title VI was Congress' response to a century-old problem. After the Civil War, states throughout the South enacted statutes or constitutional provisions requiring segregation of the races in elementary and secondary schools. U.S. COMM'N ON CIVIL RIGHTS, EQUAL PROTECTION OF THE LAWS IN HIGHER EDUCATION 9 & n. 45 (1960). North Carolina was among the worst offenders. *See, e.g.,* North Carolina Laws 1868–69, ch. 184, § 50, p. 471; North Carolina Const. 1875, Art. IX, § 2.

 Initially, many of the states' provisions did not apply to colleges or universities; nonetheless, state legislatures subsequently passed statutes extending compulsory racial segregation to higher education. U.S. COMM'N ON CIVIL RIGHTS, *supra,* at 9 & n. 47. While the Supreme Court initially gave sanction to such practices, *see Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), it ultimately found that such segregation created intolerable inequities in educational opportunities. *See, e.g., Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); *Sipuel v. Board of Regents of University of Oklahoma,* 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948); *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); *McLaurin v. Oklahoma State Regents,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). These suits had their counterpart in North Carolina in *McKissick v. Carmichael,* 187 F.2d 949 (4th Cir.), *cert. denied,* 341 U.S. 951, 71 S.Ct. 1021, 95 L.Ed. 1374 (1951). The Supreme Court finally rejected "separate but equal" public education as violative of equal protection of the laws, finding that separate educational facilities were inherently

that HEW took its first steps to enforce the nondiscrimination principle embodied in Section 601. At that time the Department sent letters of noncompliance to ten states, including North Carolina.[11] The letters indicated that each state was operating a segregated system of higher education and requested that each state submit a plan for desegregating its system within 120 days.[12] North Carolina and four other states[13] totally ignored this request, while the five others[14] submitted plans that HEW found totally unacceptable. But, following its announced policy of nonenforcement,[15] HEW took no further action against any of the states.[16]

The *Adams* plaintiffs sued HEW officials for ignoring their responsibilities under Title VI, alleging that HEW's inaction aggrieved persons in each of ten states. The District Court found that plaintiffs had stated an enforceable cause of action and concluded that HEW had "not properly fulfilled its obligation under Title VI * * * to eliminate the vestiges of past policies and practices of segregation in programs receiving federal financial assistance." *Adams v. Richardson*, 351 F.Supp. 636, 637 (D.D.C. 1972) (Memorandum Opinion). The District Court further declared that the time for

securing voluntary compliance had "long since passed" and that HEW's continued financial assistance to segregated systems of higher education violated plaintiffs' rights under Title VI. *Adams v. Richardson*, 356 F.Supp. 92, 94 (D.D.C.1973) (Declaratory Judgment and Injunction Order). It therefore ordered HEW to effect compliance with Title VI in the ten states—by instituting administrative enforcement proceedings or by any other means authorized by law—and thereby to vindicate plaintiffs' rights. *Id.* The court's order, like the plaintiffs' original complaint, was aimed at requiring HEW either to obtain compliance with Title VI or to cease distributing federal funds to the institutions of higher education in those ten states.

On appeal to this court the government argued that its actions were not reviewable in any court of law[17] and asserted that, in any event, the lower court's order "virtually transfer[red] the responsibility for the administration of Title VI to a single district judge."[18] This court, sitting *en banc,* unanimously rejected both arguments and affirmed the District Court. *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973) (*en banc*) (*per curiam*).[19] It explicitly rejected

unequal. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

The Southern states remained resistant, however, to the Court's mandate in *Brown.* They adamantly opposed desegregation of higher education, and constitutional litigation to force them to desegregate did not produce much in the way of results. Thus Congress was forced to act by statute.

11. The nine other states were Louisiana, Mississippi, Oklahoma, Florida, Arkansas, Pennsylvania, Georgia, Maryland, and Virginia.

12. *Adams v. Richardson, supra* note 5, 351 F.Supp. at 637–638. The letter to North Carolina characterized the state's system of higher education as one "in which certain institutions are clearly identifiable as serving students on the basis of race." Letter from Leon Panetta, Director, Office of Civil Rights, HEW, to Governor Leon W. Scott, February 16, 1970, *quoted in* Rentschler, *Courts and Politics: Integrating Higher Education in North Carolina*, NOLPE Sch.L.J. 1, 2 (1977).

13. Louisiana, Mississippi, Oklahoma, and Florida.

14. Arkansas, Pennsylvania, Georgia, Maryland, and Virginia.

15. HEW had an announced policy of seeking "voluntary compliance through negotiation and conciliation." *Adams v. Richardson, supra* note 5, 351 F.Supp. at 638. *See also* Note, *Judicial Control of Systemic Inadequacies in Federal Administrative Enforcement*, 88 Yale L.J. 407, 423–424 & n. 71 (1978) (describing history of *Adams* litigation).

16. *Adams v. Richardson, supra* note 5, 351 F.Supp. at 638.

17. Brief for appellants in *Adams v. Richardson, supra* note 6, at 11–16.

18. *Id.* at 10.

19. The court, *sua sponte,* decided to hear the case *en banc* because of the exceptional importance of the issues involved. In affirming, the court did give HEW an additional 180 days to secure acceptable plans, 480 F.2d at 1165.

HEW's arguments that enforcement of Title VI was committed to agency discretion and that review of such action was especially not within the jurisdiction of the District Court for the District of Columbia. *Id.* at 1161–1163. The *en banc* court noted that the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1976), commits only certain narrowly defined actions to agency discretion and concluded that Title VI stated sufficiently specific law for a court to apply on review. *Id.* at 1161–1162. Moreover, the court held that the APA and Title VI together allow an aggrieved person to bring suit in any court of competent jurisdiction and venue "to assure that the agency properly construes its statutory obligations, and that the policies it adopts and implements are consistent with those duties and not a negation of them." *Id.* at 1163–1164.

Following the court's decision, HEW identified by letter the critical requirements of acceptable desegregation plans for each of the ten states. In response, North Carolina and seven other states[20] submitted higher education plans.[21] In June 1974 HEW approved those plans. In 1975, however, appellants requested further relief, emphasizing that numerous deficiencies in the approved plans infringed upon their Title VI rights.[22] Appellants requested that HEW be required to revoke its approval of the desegregation plans that North Carolina and the other states had submitted in 1974.[23] Appellants also asked that the states be directed to submit new plans that actually would comply with Title VI.

In 1977 the District Court once again found that HEW had failed to vindicate plaintiffs' Title VI rights. *Adams v. Califano,* 430 F.Supp. 118 (D.D.C.1977) (Second Supplemental Order).[24] The court held that the desegregation plans submitted by North Carolina and the five other states[25] "did not meet important desegregation requirements" earlier specified by HEW and "have failed to achieve significant progress toward higher education desegregation." *Id.* at 119. The court therefore ordered HEW to notify the states, including North Carolina, that the plans submitted did not satisfy requirements that were critical for compliance with Title VI. *Id.* at 121.

In addition, the court ordered HEW to transmit to the states, serve upon appellants, and file with the court "final guidelines or criteria specifying the ingredients of an acceptable higher education desegre-

**20.** Oklahoma, Florida, Arkansas, Pennsylvania, Georgia, Maryland, and Virginia.

**21.** HEW referred the other two states, Louisiana and Mississippi, to the Department of Justice for enforcement proceedings. *See* note 57 *infra.*

**22.** *See* Motion for Further Relief and Points and Authorities in Support Thereof, *Adams v. Weinberger,* D.D.C. Civil Action No. 70–3095 (filed 1975).

**23.** *See* Revised North Carolina State Plan for the Further Elimination of Racial Duality in the Public Post-Secondary Education Systems (May 31, 1974) (the 1974 Plan). A copy of the plan was filed with the District Court in 1974 as Appendix XIV(e), and is part of the record on appeal in this case.

**24.** The District Court had issued its first supplemental order, dealing with HEW's failure to enforce Title VI with respect to numerous elementary and secondary school districts, in 1975. *See Adams v. Weinberger,* 391 F.Supp. 269 (D.D.C.1975), *modified sub nom. Adams v.*

*Mathews,* D.D.C. No. 70–3095 (July 17, 1975) (directing HEW to commence prompt enforcement on all complaints and setting strict deadlines for monitoring HEW's performance); *see also Adams v. Mathews,* D.D.C. No. 70–3095 (June 14, 1976). The court later ordered HEW to obtain more resources, *see Adams v. Califano,* D.D.C. No. 70–3095 (Oct. 26, 1977), and held that it would be a violation of the order not to use fully the resources that were available, *see Adams v. Califano,* D.D.C. No. 70–3095 (Dec. 29, 1977).

**25.** The other states were Arkansas, Florida, Georgia, Oklahoma, and Virginia. The court deferred action with respect to: Louisiana and Mississippi, which were the subject of judicial enforcement proceedings elsewhere; Maryland, whose claim that HEW failed adequately to engage in voluntary compliance was pending before another Court of Appeals; and Pennsylvania, which was in the midst of settlement negotiations. Thus, where the Department was fulfilling its legal obligations, the court deferred action. On the other hand, with respect to the six states where the Department had failed to do so, the court required that the plans be revoked.

gation plan." *Id.* In particular, the court recognized:

> the need to obtain specific commitments necessary for a workable higher education desegregation plan * * * concerning admission, recruitment, and retention of students * * *, concerning the placement and duplication of program offerings among institutions * * *, the role and the enhancement of Black institutions * * *, and concerning changes in the racial composition of the faculties involved * * *.
> * * *

*Id.* at 120.

In directing the parties to draft the order, the District Judge made clear that he wanted the Department to be "under the compulsion of a Court Order to submit to the states certain *specific requirements* which the states *must* respond to * * *." [26] This directive reflected the concern of this

court *en banc* that HEW had "not yet formulated guidelines for desegregating statewide systems of higher learning * * *." 480 F.2d at 1164.[27] The District Court therefore ordered HEW to require the six states to submit desegregation plans revised in accordance with these criteria within 60 days of their receipt, and to accept or reject such submissions within 120 days thereafter. 430 F.Supp. at 121.

Pursuant to both the "specific direction" of the District Court and the *en banc* opinion of this court, HEW issued "Amended Criteria Specifying Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education," 42 Fed.Reg. 40780 (1977) (hereafter *Amended Criteria*), Appendix of Plaintiffs-Appellants (App.) 102. By the Department's own concession,[28] these decisions interpreted both Title VI [29] and the Constitution [30] as imposing an

---

26. Transcript of January 17, 1977 Hearing at 54 (emphasis added).

27. This court, 480 F.2d at 1164 n. 9, cited *Alabama NAACP State Conference of Branches v. Wallace,* 269 F.Supp. 346 (M.D.Ala.1967). In that case a three-judge court had stressed the importance of "explicit, certain and definite" guidelines for assuring compliance with the law. *Id.* at 352. As the court stated, "*In the absence of judicial review,* the school authorities may and should respect the Guidelines as a reliable guide to what the Department's enforcement action should be." *Id.* at 351 (emphasis added). Thus the court envisioned that unreviewed voluntary compliance would proceed along the criteria stated in the Guidelines, with exceptions to be allowed under proper judicial scrutiny.

28. *See Amended Criteria,* 42 Fed.Reg. at 40780, 40781, App. 102, 103 (states have "statutory obligation to devise and implement plans that are effective in achieving the desegregation of the system").

29. HEW regulations implementing Title VI provided that where a recipient of federal funds had previously discriminated on the basis of race "the recipient must take *affirmative action* to overcome the effects of prior discrimination." 45 C.F.R. § 80.3(b)(6)(i) (1977) (emphasis added). These regulations still exist. *See* 34 C.F.R. § 100.3(b)(6)(i) (1982).

30. Relying on the Fourteenth Amendment, the Supreme Court long ago made clear that public

school officials have "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board of New Kent County,* 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716 (1968). This duty was to be implemented "*now,*" *id.* at 439, 88 S.Ct. at 1694 (emphasis in original), and the objective was "to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). While the Supreme Court has not made clear the precise application of its desegregation doctrines to institutions of higher education, the weight of precedent at the lower court level confirms the application of the duty to integrate to institutions of higher education. *See, e.g., Norris v. State Council of Higher Education,* 327 F.Supp. 1368, 1373 (E.D.Va.) (three-judge court), *aff'd per curiam,* 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971); *Sanders v. Ellington,* 288 F.Supp. 937, 942 (M.D.Tenn.1968). These cases hold that, while "[t]he means of eliminating discrimination in public schools necessarily differ from its elimination in colleges, * * * *the state's duty is as exacting.*" *Norris, supra,* 327 F.Supp. at 1373 (emphasis added). In issuing the criteria the Department concluded that "[t]he affirmative duty to desegregate applies with equal force to higher education." *Amended Criteria,* 42 Fed.Reg. at 40780, App. 102 (*citing Norris, supra; Lee v. Macon County Board of Education,* 267 F.Supp. 458 (M.D.Ala) (three-judge court), *aff'd,* 389 U.S. 215, 88 S.Ct. 415,

*affirmative duty* on the states to devise plans that would be effective in desegregating higher education systems.[31] The Department recognized that the court had directed it "to prepare criteria which would identify for the states the specific elements to be included in their revised desegregation plans." 42 Fed.Reg. at 40781, App. 103.[32] After further negotiations with all of the affected states and the *Adams* plaintiffs,[33] HEW then promulgated "Revised Criteria" to provide *"specific guidance to the states and at the same time [be] sufficiently flexible to provide for circumstances which may vary from state to state." See* Revised Criteria Specifying Ingredients of Acceptable Plans to Desegregate State School Systems of Public Higher Education, 43 Fed.Reg. 6658 (1978) (emphasis added) (hereafter *Revised Criteria*). Thus the criteria were developed with the unique needs and circumstances of *each* of the relevant states, including North Carolina, in mind.[34]

Following publication of the criteria, HEW attempted to secure revised plans from the six states. By early 1979 the Department had obtained acceptable plans from five of them.[35] But HEW's efforts to negotiate with North Carolina proved fruitless.[36] To begin with, HEW *would not accede to North Carolina's demand that the settlement offer be submitted to a court in the form of a proposed consent decree.* It explained that "HEW's enforcement of Title VI would be irreparably undermined if a recipient of funds could routinely by-pass statutorily-mandated administrative compliance procedures by the expedient of filing a lawsuit and then obtaining a substantive consent decree * * *."[37] Rather, the matter could "be settled only by the submission of an acceptable desegregation plan, to be monitored and enforced administratively, with the lawsuit dismissed by consent."[38] Second, HEW *concluded that the measures North Carolina had proposed in its latest submission offered "no realistic promise * * * of desegregating the UNC [University of North Carolina] system in the foreseeable future, as the law requires."*[39] Indeed, the government assert-

---

19 L.Ed.2d 422 (1967); *Geier v. Dunn,* 337 F.Supp. 573 (M.D.Tenn.1972)).

**31.** *Amended Criteria,* 42 Fed.Reg. at 40780–40781, App. 102–103. *See* Comment, *Integrating Higher Education: Defining the Scope of the Affirmative Duty to Integrate,* 57 Iowa L.Rev. 898 (1972); Note, *The Affirmative Duty to Integrate in Higher Education,* 79 Yale L.J. 666 (1970).

**32.** It further noted that "[c]onsistent with the requirements of Title VI these criteria set forth the elements of a desegregation plan which would eliminate the effects of past discrimination." *Amended Criteria,* 42 Fed.Reg. at 40781, App. 103; *see Adams v. Califano, supra* note 5, 430 F.Supp. at 121.

**33.** The Department undertook an extensive consultation process in formulating the criteria. Parties participating in the consultation process included a departmental task force, the six states to whom the Guidelines would apply, students, officials of the National Association for Equal Opportunity in Higher Education, two panels of nationally recognized educators, plaintiffs' representatives, and citizens from the six states. *Revised Criteria,* 43 Fed.Reg. at 6658, 6660–6661.

**34.** *See* also note 78 *infra.* In a separate publication Joseph A. Califano, Jr., the Secretary of HEW who developed the Criteria, has said:

Within the limits of the court orders, the means were left to the state governors, legislatures, and higher education system. We tried to draw a line between "education decisions," properly left to the states, and decisions that perpetuated dual systems. * * * J. Califano, Governing America 247 (1981). Within this sphere, however, states' plans had to comply with the letter of the Criteria. *Id.* at 248.

**35.** The process of securing these plans is described in *id.* at 248–250.

**36.** Then-Secretary Califano described North Carolina to be the most "intractable state of all," *id.* at 250, and the negotiating effort with it to be a "wrenching dispute," *id.* at 244.

**37.** Letter from James P. Turner, Deputy Assistant Attorney General, Civil Rights Division, Department of Justice, to Joseph J. Levin, Jr., July 23, 1979, at 1, App. 108.

**38.** *Id.* (emphasis added). But the government added that such a dismissal would "be without prejudice to [North Carolina's] * * * seeking judicial review of any *future* adverse administrative action." *Id.* (emphasis added).

**39.** Letter from Albert T. Hamlin, Assistant General Counsel, Civil Rights Division, HEW,

ed that North Carolina's current proposal was "a large step backwards from the positions which pre-dated the lawsuit,"[40] and was unacceptable because it did not meet the requirements of the *Revised Criteria.*[41]

Having failed to obtain an acceptable plan, HEW filed a Notice of Opportunity for Hearing in April 1979 to determine whether federal funds to assist higher education in North Carolina should be terminated. North Carolina immediately filed suit against HEW in the United States District Court for the Eastern District of North Carolina (hereafter the North Carolina court). *State of North Carolina v. Dep't of HEW,* 480 F.Supp. 929 (E.D.N.C.1979). North Carolina challenged HEW's effort to enforce Title VI and sought, *inter alia,* to enjoin the hearing and HEW's deferral of federal aid during the hearing's progress.[42] The government, in response, requested that the North Carolina court either dismiss the lawsuit for lack of jurisdiction, *id.* at 934,[43] or transfer the action to the District Court for the District of Columbia, *id.* at 931.[44] The North Carolina court refused to enjoin the administrative hearing, but restrained HEW from imposing a limited de-

ferral of funds.[45] *Id.* at 939. It also refused to transfer the case to the District of Columbia or to dismiss for lack of jurisdiction. *Id.* at 931, 935. Instead, it stayed judicial proceedings until the agency action had run its course since "technical questions of non-compliance should, initially, be left to the Secretary of HEW with judicial review as a final check on his methodologies." *Id.* at 937 n. 4, 940 n. 8. The government apparently did not appeal these adverse rulings because it had prevailed in its efforts to start the administrative hearing process.

DE commenced a formal hearing before an administrative law judge (ALJ) in July 1980. The *Adams* plaintiffs were allowed a limited right to intervene. Over a period of nine months the parties presented their affirmative cases, creating a record of 15,000 pages and 500 exhibits. On June 20, 1981, however, the hearing was aborted because the government and North Carolina agreed finally to settle their dispute.[46] Appellants were notified of the proposed agreement and were served with a copy of it two days later.[47]

On June 25, 1981 the *Adams* plaintiffs went to the District Court seeking a tempo-

to Joseph J. Levin, Jr., December 18, 1979, at 1, App. 111 (emphasis added).

**40.** Letter, *supra* note 37, at 2, App. 109. The plan was "virtually identical" to the 1974 plan, and one member of North Carolina's own university board, civil rights attorney Julius Chambers, resigned because of it, charging that the plan was "not a sincere commitment to see that minorities [were] brought into the system." J. CALIFANO, *supra* note 34, at 251.

**41.** *See Letter, supra* note 39, at 3–5, App. 113–115.

**42.** North Carolina contended that the enforcement proceeding was unauthorized by Title VI and violated various norms of constitutional and administrative law. *State of North Carolina v. Dep't of HEW,* 480 F.Supp. 929, 937–938 (E.D.N.C.1979).

**43.** The government argued that jurisdiction did not arise under 42 U.S.C. § 2000d–1 until after an adverse decision had been rendered in the administrative hearing process. 480 F.Supp. at 934–935. The government also contended that the administrative proceeding would provide the state with an adequate forum in which to raise all its legal and factual contentions concerning Title VI and the Constitution. *Id.*

**44.** The government sought to transfer the case under 28 U.S.C. § 1404(a) (1976) because of comity principles and because the North Carolina suit collaterally attacked the *Adams* orders. *Id.* at 931. HEW asserted that transfer was necessary to prevent courts of concurrent jurisdiction from foisting inconsistent obligations upon it. *Id.*

**45.** The *Adams* plaintiffs then sought injunctive relief in the District Court against the Department to require a deferral of funds. But the court expressly refused to grant relief on comity grounds. *Adams v. Harris,* D.D.C. Civil Action No. 70–3095 (Oct. 18, 1979).

**46.** The Secretary credited United States Senator Jesse Helms with helping to get the talks started. Washington Post, June 21, 1981, at A11, col. 1–2. This article was brought to the court's attention by the government. *See* brief for appellees at 7.

**47.** *See* Letter from Frank K. Krueger to Joseph Rauh, June 22, 1981, Appendix A to Points and Authorities in Support of Issuance of a Temporary Restraining Order and Preliminary Injunction in *Adams v. Bell,* D.D.C. Civil Action No. 70–3095 (filed June 25, 1981). The consent decree appears in the record at App. 32.

rary restraining order and preliminary injunction to stop the Secretary from accepting the proposed agreement. The District Court denied the requested relief. *Adams v. Bell,* D.D.C. Civil Action No. 70–3095 (June 25, 1981), App. 26–30. The *Adams* plaintiffs filed their appeal the next day.

Before this court could consider the merits of their appeal, the Secretary accepted the settlement. He then joined with North Carolina in presenting the settlement to the North Carolina court for its imprimatur. The North Carolina court promptly scheduled a hearing regarding the proposed decree for July 13, 1981, and gave the *Adams* plaintiffs notice and opportunity to appear as *amicus curiae.* The *Adams* plaintiffs never sought to intervene as a party to the action[48] and the North Carolina court did not inquire whether they were parties needed for a just adjudication.[49] DE and North Carolina filed memoranda in support of the decree and attached as support the record of the administrative hearing as it had been completed to date. The *Adams* plaintiffs filed as *amicus* a memorandum in opposition, and contended that, without rebuttal evidence and administrative findings, the administrative record was an inadequate basis for judging the proposed decree. Nevertheless, on July 17, 1981 the North Carolina court approved the proposed consent decree. *North Carolina v. Dep't of Education,* E.D.N.C. No. 79–217–CIV–5 (Memorandum Decision, July 17, 1981).[50]

Today, this court affirms the District Court's June 25, 1981 denial of plaintiffs'

request for relief. It apparently agrees with the District Judge that the requested relief "was outside the scope of [the District Court's] prior decrees supervising the enforcement efforts of the Department." Maj. op. at 163. In the court's view, these prior orders were limited—and necessarily so—to situations which indicate that the Department has adopted a general policy of nonenforcement. Thus neither these orders nor the statute authorize the District Court to review a compliance agreement entered into after the Department had started an administrative enforcement proceeding against the state. *See* maj. op. at 162–163, 165, 166 n. 30, 166, 168. Rather, in the court's view, appellants' only recourse against such compliance agreements is through a Title VI suit against the state itself or through intervention in a court reviewing the settlement at the request of the government and the state. Maj. op. at 167, 168–170. I think that both the District Court and this court are plainly wrong.

## II. TITLE VI AND THE *ADAMS* ORDERS

In the decision below the District Court found that its authority to review agency action was limited to judging agency compliance "with its statutory [and] constitutional responsibilities,"[51] and did not extend to review of specific questions concerning the "individual states and school districts with which the Agency has to deal."[52] Therefore, the District Court concluded that

---

**48.** *North Carolina v. Dep't of Education,* E.D.N.C. No. 79–217–CIV–5 (Memorandum Decision, July 17, 1981) at 2 n. 1, App. 120.

**49.** *See* Fed.R.Civ.P. 19(a) & (b). Rule 19(a) clearly requires the court to join parties who will be ultimately affected by its judgment. If the persons cannot be joined, then Rule 19(b) requires the court to determine whether in "equity and good conscience" the action should proceed without them. The North Carolina court did not conduct either the Rule 19(a) or (b) inquiry.

**50.** The North Carolina court made two substantive findings: (1) that the settlement did not violate, in any way, the orders of the District Court for the District of Columbia or the orders of this court, and (2) that the plan which

the decree embodied substantially complied with the criteria promulgated by HEW in 1977. In accordance with the decree, the North Carolina court agreed to retain jurisdiction over the case until December 31, 1988, and to monitor compliance by North Carolina with Title VI and the Fourteenth Amendment. Finally, a provision in the consent decree obligates the government to dismiss without prejudice the administrative enforcement proceeding against North Carolina.

**51.** Transcript of June 25, 1981 Proceeding at 25, App. 30.

**52.** *Id.* at 24, App. 29.

it "wholly lacked jurisdiction" to enjoin the Department from accepting a settlement that allegedly did not comport with the Department's own criteria for what constitutes an acceptable desegregation plan.[53] To understand why the District Court had authority to determine the merits of appellants' claim, and therefore to grant the requested relief,[54] it is necessary to review the scheme Congress created for enforcing Title VI and how the prior decrees of the courts of this circuit fit within that scheme.

### A. Title VI Enforcement Scheme

Section 601 of the Civil Rights Act gives every person participating in a program receiving federal financial assistance the right to be free from racial or ethnic discrimination. 42 U.S.C. § 2000d. Congress was plainly dissatisfied with agency efforts to ensure nondiscriminatory use of federal funds and hoped to root out the vestiges of such discrimination by conditioning distribution of federal funds on its cessation.[55] But Congress enacted a very elaborate scheme for implementing this plan because some funding terminations harm beneficiaries of programs funded as much as they harm fund recipients themselves.[56] This scheme is embodied principally in Sections 602 and 603 of the Act. See 42 U.S.C. §§ 2000d–1 and 2000d–2.

Section 602 requires all federal agencies to effectuate the antidiscrimination provisions of the law. 42 U.S.C. § 2000d–1. It unambiguously contemplates that agency action is the principal mechanism for enforcing the federal policy of nondiscrimination: Every federal department or agency furnishing financial support is to implement the nondiscrimination proscription by appropriate rule or regulation. Id. If a fund recipient does not comply with those rules and regulations, then the department or agency must terminate the flow of funds. Id.

But Section 602 also indicates that termination of funds is a serious enforcement step, and an agency is not to terminate funds without exhausting every possibility for conciliation. Thus the Department must make every effort to secure compliance by voluntary means. Id. If the Department determines that compliance by voluntary means is not possible, then it

---

**53.** Id. at 25, App. 30. Although the District Court spoke of lacking "jurisdiction," id., no one disputes that it had jurisdiction over the persons and the subject matter. Compare brief of plaintiffs-appellants at 16–22 (federal courts have jurisdiction over this type of action) with supplemental brief for appellees at 13–17 ("The district court did not rule that it lacked jurisdiction to enforce its orders.") (emphasis in original).

In 1972 the District Court identified six separate statutory bases for jurisdiction over appellants' original lawsuit against the enforcement agency. Adams v. Richardson, supra note 5, 351 F.Supp. at 640. These statutory provisions were: 5 U.S.C. §§ 701–706 (review of agency action under the Administrative Procedure Act); 28 U.S.C. § 1331 (general federal question jurisdiction); id. § 1343(4) (jurisdiction over actions to protect civil rights); id. § 1361 (jurisdiction over action to compel officer of the United States to perform his duty); id. § 2201 (declaratory judgment authority); id. § 2202 (granting of further necessary relief). At no point in the subsequent history of the lawsuit has anyone questioned the lower court's jurisdiction, and these six statutes definitively establish that jurisdiction.

**54.** The court recharacterizes, and I think correctly, the District Court's statement that it

"wholly lacked jurisdiction" to be a mere statement that it could not grant the relief appellants requested, even though it technically had jurisdiction and venue. Maj. op. at 167 n. 34. Thus the District Court's denial of the relief requested amounts to a dismissal for failure to state a claim upon which relief could be granted. See Fed.R.Civ.P. 12(b)(6). In other words, the District Court's statements concerning "jurisdiction" were directed to the relief available to it, and it denied the request for relief because it saw the Adams plaintiffs' challenge as reaching beyond any relief it had granted or could grant. This is precisely what the government asserts before this court. See supplemental brief for appellees at 13–17 (Adams plaintiffs' challenge to the North Carolina settlement beyond the reach of litigation in the District Court).

**55.** 110 Cong.Rec. 6544–6546 (1964) (remarks of Sen. Humphrey).

**56.** See, e.g., id. at 2490 (remarks of Rep. Boggs); id. at 2498 (remarks of Rep. Willis). For an elaborate review of the debates, see NAACP v. Medical Center, Inc., 599 F.2d 1247, 1253–1255 (3d Cir.1979).

must initiate the formal proceedings that are condition precedent to a termination of funds.[57] *Id.* But even during these formal proceedings the department or agency must seek voluntary compliance, and any agreements reached during this period are to be given the same effect as if they had been negotiated before the "setting down of [the] case for hearing." *Adams v. Richardson, supra,* 480 F.2d at 1165. Finally, prior notice must be given to Congress in each case where, at the conclusion of the formal proceedings, the department or agency proposes to terminate funds. 42 U.S.C. § 2000d–1.

Once the Department has exhausted its efforts under Section 602, as indicated by its "final" finding of compliance or noncompliance (and the concomitant decision to continue or terminate funding), judicial review becomes available under the terms of Section 603. *Id.* § 2000d–2. Section 603 first renders "[a]ny department or agency action taken pursuant to section [602] * * * subject to such judicial review as may otherwise be provided by law * * *." *Id.* One such other provision in law, as specifically identified in the legislative history of the Act,[58] is the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1976). The APA entitles any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of [Title VI]" to obtain judicial review. *Id.* § 702. Furthermore, Section 603 independently authorizes an aggrieved person, including a state or political subdivision thereof, to obtain judicial review only when the Department makes a "final" finding of noncompliance and orders a termination of funds. 42 U.S.C. § 2000d–2. Under both provisions of Section 603, the persons aggrieved are entitled to judicial review in the venue of their choice. 28 U.S.C. § 1391(e) (1976). But, in either case, courts are not to resolve particular questions of fund recipient compliance or noncompliance; rather, they are to review—in the traditional and deferential manner in which courts review agency action—the Department's resolution of these compliance questions. *See Adams v. Richardson, supra,* 480 F.2d at 1164 n. 6 (discussing nature of judicial review in these actions).[59]

---

**57.** These formal proceedings can take several different forms. First, the distributing agency may initiate a formal administrative hearing of its own to determine whether the fund recipient is in compliance with Title VI. 42 U.S.C. § 2000d–1. In this proceeding an Administrative Law Judge will make preliminary findings of fact and conclusions of law, which can then be reviewed and changed, in turn, by an interdepartmental review board, the secretaries of the respective agencies, or the courts. *See* 34 C.F.R. § 100.10 (1982). This is the traditional means by which administrative enforcement occurs, and is the route the Department chose in this case.

Alternatively, the statute authorizes the agencies to ensure that compliance is effected "by any means authorized by law." *Id.* Regulations issued under the authority of this statute define these other means to include (1) a referral to the Justice Department with recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States, and (2) any applicable proceeding under state or local law. 45 C.F.R. § 80.8 (1982). This course has been chosen in the government's efforts to get Louisiana and Mississippi to comply with Title VI. *See, e.g., United States v. Louisiana,* 527 F.Supp. 509 (E.D.La.1981) (order of three-judge court approving consent decree in Justice Department's settlement of government's ongoing Title VI desegregation case); *United States v. Finch,* N.D.Miss. Civil Action No. D.C. 75–9–P (filed in March 1975).

**58.** *See* H.R.Rep. No. 914, *supra* note 1, at 25–26 (APA-type review the primary mechanism by which § 603 operates).

**59.** Thus, if the Department decides to continue funding without completing the formal proceedings, judicial review would be that customarily applied to informal agency action. *See* 5 U.S.C. § 706(2)(A) (1976) (arbitrary, capricious, abuse of discretion, or without authority of law); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). On the other hand, if the Department reaches its decision—either to continue or to terminate funding—at the conclusion of formal proceedings, judicial review would be that customarily applied to formal adjudicatory procedures. *See* 5 U.S.C. § 706(2)(E) (1976) (substantial evidence review applicable to formal adjudicatory procedures). Of course, if the Department refers a case to the Justice Department for an enforcement action, a court in that situation would, of necessity, apply *de novo* review.

This traditional judicial review of administrative action is all that appellants asked for in the District Court. They wanted the District Court to determine whether the Department's application (or nonapplication) of the *Revised Criteria* in the North Carolina settlement was a proper and consistent use of the rules the Department has adopted in implementing its duties under Section 602.[60] Appellants alleged that they were aggrieved by the proposed settlement and that the Secretary would be acting without authority of law if he accepted it.[61] In my judgment, Section 603 and the APA unambiguously give appellants a right to review of this final agency action.[62]

B. *The* Adams *Orders*

In dismissing appellants' challenge to the Department's proposed acceptance of the settlement, this court and the District Court hardly cite to Section 603 or to the APA. Rather, they rely on a footnote in the 1973 *en banc Adams* decision.[63] In footnote 5 of that opinion the court stated, in part:

> Far from dictating the final result with regard to any of these districts, the order [of the District Court issued in 1972] merely requires initiation of a process which, excepting contemptuous conduct, will then pass beyond the District Court's continuing control and supervision. * *

*Adams v. Richardson, supra,* 480 F.2d at 1163 n. 5. This court and the District Court now interpret this footnote as requiring only that the Department initiate an enforcement proceeding once it has determined that voluntary compliance is not possible.[64] As a corollary, they read this footnote as prohibiting District Court review of particular compliance decisions the Department makes after the enforcement proceeding has begun.[65] This literal reading of footnote 5 cannot stand alone against either the remainder of the 1973 *en banc* decision or the District Court's 1977 order, both of which followed directly from the Title VI enforcement scheme.

1. En banc *decision.*

To begin with, the 1973 *en banc* decision recognized that Section 603 and the APA authorize judicial review of *all* agency action that allegedly aggrieves persons entitled to the protection of Title VI.[66] The

---

**60.** It is a well established precept that government agencies must generally conform to their own rules and regulations, especially where those rules are to have substantive effect. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *see also United States v. Heffner,* 420 F.2d 809 (4th Cir.1970); *Equal Employment Opportunity Comm'n v. Western Electric Co.,* 382 F.Supp. 787 (D.Mich.1974).

The published desegregation criteria certainly fall within the APA's definition of a rule. 5 U.S.C. § 551(4) (1976) states that a "rule means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement * * * law or policy * * *." The Department stated in the original publication of the desegregation criteria that they were to be binding and to have substantive effect. *See Amended Criteria,* 42 Fed.Reg. at 40780, 40781, App. 102, 103; *Revised Criteria,* 43 Fed.Reg. at 6658, 6659. An agency statement that is binding and that has substantive effect is a rule. *See, e.g., Guardian Federal S. & L. Ass'n v. Federal S. & L. Ins. Corp.,* 589 F.2d 658, 666–669 (D.C.Cir.1978); *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1112–1113 (D.C.Cir.1974).

**61.** *See* brief of plaintiffs-appellants at 17; *see also* Transcript of June 25, 1981 Proceeding at 18, App. 23 (the court's "jurisdiction [was] the very same jurisdiction that began this case; that the government is giving substantial federal funds to these recipients").

**62.** A settlement is undoubtedly final agency action that an allegedly aggrieved person can ask a court to review. *See, e.g.,* 5 U.S.C. § 554(c) (1976); *Center for Auto Safety v. Lewis,* 685 F.2d 656 (D.C.Cir.1982).

**63.** *See* maj. op. at 164 n. 24; Transcript of June 25, 1981 Proceeding at 23, App. 28.

**64.** Maj. op. at 164 n. 24; Transcript of June 25, 1981 Proceeding at 25, App. 30.

**65.** Maj. op. at 165–166 n. 30; Transcript of June 25, 1981 Proceeding at 24, App. 29.

**66.** The court stated that the only agency action *not* subject to judicial review (and committed to agency discretion) was that where there was no law to apply. *Adams v. Richardson, supra* note 6, 480 F.2d at 1161–1162. *See Citizens to Preserve Overton Park, Inc. v. Volpe, supra* note 59, 401 U.S. at 410, 91 S.Ct. at 820.

court held that enforcement was not a matter committed to absolute agency discretion [67] and that Title VI and the APA authorized courts to take all steps necessary to ensure that HEW "end segregation in public educational institutions receiving federal funds." *Id.* at 1161. The *en banc* court understood that HEW—and not the courts around the country—would initially resolve particular questions of fund recipient compliance. *Id.* at 1163. But the court also recognized that reviewing courts should assure that the agency "properly construe[d] its statutory obligations, and that the policies it adopt[ed] and implement[ed] [were] consistent with [its statutory] duties and not a negation of them." *Id.* at 1163–1164. This type of review, the court noted in yet *another* footnote, "is consistent with the nature of judicial review exercised in other situations." *Id.* at 1164 n. 6.[68] Thus, though the court did not want the District Court substituting its judgment for that of the Department, neither did it intend to insulate the Department's final decisions from review. Denying the District Court's authority to assess the merits of the settlement in this case, however, would prevent it from performing that review function.

Furthermore, this court's statement in footnote 5—that enforcement would "pass beyond the District Court's continuing control and supervision" after initiation of administrative proceedings—simply reflected the status of the case as it had been presented to the court. At that time HEW had never before initiated an enforcement proceeding.[69] The case was one of agency *inaction* and this court, as it has done in other circumstances, *see, e.g., WWHT, Inc.*

*v. FCC*, 656 F.2d 807 (D.C.Cir.1981); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584 (D.C.Cir.1971), was requiring the agency to *act.* The court's decision was *lowering* the longstanding bar to judicial supervision of agency decisions to prosecute. It is inconceivable that the court was simultaneously *erecting* a new bar to traditional judicial review of agency enforcement action. Footnote 5 merely reflects the time-honored wisdom that courts are not to interfere with the conduct of ongoing administrative proceedings. *See Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). It does not and cannot bar normal judicial review of final agency action.[70] *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). To read it as doing so undermines Section 603 and our accepted jurisprudence of administrative law.

### 2. *District Court decrees.*

The District Court's own prior orders reflect this unexceptional interpretation of the statute and the *en banc* decision. In 1977 this case did return to the District Court's "control and supervision" for review of agency resolutions of fund recipient compliance with Title VI. *Adams v. Califano, supra,* 430 F.Supp. 118. First, the District Court ordered the Department to revoke its acceptance of North Carolina's 1974 Desegregation Plan and the plans of five other states because they were "not adequate to comply with Title VI of the 1964 Civil Rights Act." [71] The District Court found

---

**67.** *Adams v. Richardson, supra* note 6, 480 F.2d at 1162.

**68.** The court gave three examples of the kind of review it found consistent with what it was approving: substantial evidence review of an Interstate Commerce Commission order granting a motor carrier certificate, *see Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 165–169, 83 S.Ct. 239, 244–246, 9 L.Ed.2d 207 (1962); reversal of HEW fund termination for failure to make separate findings of fact, *see Board of Public Instruction of Taylor County,*

*Fla. v. Finch,* 414 F.2d 1068, 1073–1075 (5th Cir.1969); and scrutiny of ICC opinion to determine if in excess of statutory authority, *see Elgin, Joliet & Eastern R. Co. v. Benj. Harris & Co.,* 245 F.Supp. 467, 472 (N.D.Ill.1965).

**69.** *See* notes 11–19 *supra* and accompanying text.

**70.** *See* note 59 *supra.*

**71.** 430 F.Supp. at 121.

much evidence that HEW's acceptance of these plans was contrary to law.[72] Second, in 1977 the District Court ordered the Department to transmit "final guidelines"[73] that would constitute "specific requirements which the state *must* respond to * * *."[74] It ruled that HEW had the responsibility to devise those criteria and to obtain "specific commitments" from the states.[75] Pursuant to the court's "specific direction,"[76] the Department developed those criteria and subsequently applied them to the five other states.[77] Anything less would have reduced "the entire process to a meaningless exchange of theory rather than a determination of fact." *Mayor &*

*City Council of Baltimore v. Mathews,* 562 F.2d 914, 922 (4th Cir.1977).[78]

These actions in 1977 are antithetical to the court's attempt to narrow the District Court's authority in this case. Both then and now appellants have argued that the Department accepted voluntary desegregation plans that fail to meet "the requirements of [DE's] own detailed letters [and Desegregation Criteria] * * *."[79] In both cases appellants have complained that they are aggrieved within the meaning of Title VI. The two cases are simply indistinguishable; if the District Court had authority to review agency action in 1977, it had that exact same authority in 1981.[80]

72. HEW even admitted that the plans were inadequate. *Adams v. Califano, supra* note 5, 430 F.Supp. at 120. But the court found other evidence that the plans the agency accepted were in violation of the law. *See id.* at 120 n. 1. It invalidated that agency action as arbitrarily and capriciously taken on the basis of all this evidence. This was the exact type of review that this court *en banc* in 1973 had contemplated. *Adams v. Richardson, supra* note 6, 480 F.2d at 1164 n. 6; *see also* note 68 *supra* and accompanying text.

73. *Adams v. Califano, supra* note 5, 430 F.Supp. at 121.

74. Transcript of January 17, 1977 Hearing at 54 (emphasis added). Another federal District Court had also specifically ordered adoption of such criteria. *See Mayor & City Council of Baltimore v. Mathews,* 571 F.2d 1273, 1276 (4th Cir.) (Winter, J., concurring and dissenting) (District Court enjoined Secretary of HEW to "adopt specific standards for compliance with Title VI by institutions of higher education"), *cert. denied,* 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978), *aff'g by equally divided Court Mandel v. HEW,* 411 F.Supp. 542 (D.Md. 1976). *See also Alabama NAACP State Conference of Branches v. Wallace, supra* note 27, 269 F.Supp. at 351 (Civil Rights Act of 1964 requires Department to act pursuant to guidelines of general applicability).

75. 430 F.Supp. at 120.

76. *Amended Criteria,* 42 Fed.Reg. at 40780, App. 102.

77. *See* note 35 *supra* and accompanying text.

78. The court correctly points out that the 1977 order "did not dictate specific compliance criteria but left the choice among the lawful criteria

to the discretion of the Department and of the states." Maj. op. at 165. Pursuant to that 1977 order, however, the Department engaged in extensive study of higher education problems, and formulated (and then revised) the criteria. *See* notes 28 & 33 *supra.* The states were under "a statutory obligation to devise and implement plans" in accordance with these criteria, and modifications were to be allowed only "upon a showing of exceptional hardship or special circumstances." *Revised Criteria,* 43 Fed.Reg. at 6659. Thus, contrary to the court's assertion, *see* maj. op. at 163–164, the point of the various court orders was to have the Department obtain exacting compliance with the criteria *once they were published.*

It is of no moment that the criteria issued have never been endorsed by the District Court. An agency of government is bound by its rules, regulations, and procedures regardless of whether they have been the subject of judicial review. *See* note 60 *supra.*

79. *See* Motion for Further Relief and Points and Authorities in Support Thereof in *Adams v. Weinberger,* D.D.C. Civil Action No. 70–3095 (filed in 1975) (motion leading to *Adams v. Califano, supra* note 5).

80. The court and the government offer several reasons for distinguishing the 1977 action from the relief appellants requested in 1981. However, on analysis none stands up.

First, the government claims that the District Court's 1977 order was in large part based on the Department's own admission that the plan was not acceptable. *See* supplemental brief for appellees at 51 n. 16. But the District Court explicitly stated that its order was based on all of the evidence. *See* note 72 *supra.* More importantly, the fact is that the District Court did review the plan and order it revoked. The government's argument amounts to a claim that the District Court has authority to order a

I am therefore at a considerable loss to understand this court's assertion that District Court review would "reverse the normal relations between agency and court." Maj. op. at 166. The District Court's 1973 and 1977 orders required the Department to specify the criteria by which voluntary compliance agreements would be judged, as this court [81] and the agency's own regulations [82] commanded the Department to do. The Department complied with those orders and assumed full responsibility for the criteria it developed.[83] The injunction appellants seek in this case would simply require the Department to follow its own rules for compli-

ance with Title VI.[84] This is hardly, as the court asserts, see maj. op. at 166, an encroachment upon the role of the institution responsible for implementing Title VI.[85] Rather, it is part and parcel of the traditional relations between agency and court, wherein agencies resolve particular questions and courts provide limited review of their actions.

## C. Requesting Relief Under This Scheme

It should now be exceedingly clear that appellants' request for relief should have been granted. The prior orders of the

---

plan revoked when the government wants it revoked and the District Court does not have authority to order a plan revoked when the government does not want it revoked. While this result would surely please the government, courts have *never* based their authority to order relief on the defendant's desire that the plaintiff receive the requested relief.

Second, the court argues that the 1977 order "was premised upon failure of the plans to satisfy the Department's *own* desegregation criteria—criteria which had never been passed upon by the district court." Maj. op. at 165 n. 30 (emphasis in original). But appellants' 1981 request was similarly premised on the failure of the 1981 settlement to comply with the Department's *Revised Criteria*. The only difference between the desegregation criteria involved in the two plans is that one set was communicated in private letters and the other set was published in the Federal Register. But this is more, not less, reason to make the Department abide by the desegregation criteria in the 1981 settlement. *See* notes 60, 78 *supra*.

Third, and "[m]ore importantly, the decision which provided the ground for the court's scrutiny [in 1977] preceded any enforcement action." Maj. op. at 163–164 n. 30. But mere initiation of an administrative proceeding does not affect the court's authority to review a voluntary compliance agreement that is challenged by an allegedly aggrieved plaintiff. *See* notes 59, 62 *supra*. Section 603 unambiguously applies to all agency action taken pursuant to § 602, which includes both voluntary compliance agreements and formal enforcement action. *See* 42 U.S.C. §§ 2000d–1, 2000d–2, *see also* note 66 *supra*. Neither the 1974 nor the 1981 agreement was negotiated in a formal, on-the-record administrative proceeding. Rather, both were voluntary compliance agreements reached through "informal negotiation." These informal agreements constitute final agency actions, and as such fall within the scope of the 1977 order and the statute, wheth-

er an administrative proceeding has started or not.

Fourth, the court states that the 1977 order differs from the relief requested here because the 1981 plan culminated in a court order. Maj. op. at 166 n. 30. But since the North Carolina court acted *after* the District Court denied the motion for relief, this judicial decree could not have been a consideration for the District Court in *its* determination of the scope of its prior decrees. It can be a consideration for this court, on appeal, in determining whether relief can *still* be awarded, but that is a question of mootness, not of authority to review in the District Court.

**81.** *See Adams v. Richardson, supra* note 6, 480 F.2d at 1164 & n. 9.

**82.** *See* 45 C.F.R. § 80.6(b) (1982).

**83.** *See Revised Criteria*, 43 Fed.Reg. at 6661 ("The Department assumes full and sole responsibility for the content of these criteria.").

**84.** *See* note 60 *supra* and accompanying text.

**85.** I agree with the court that "these decrees correct systemic defalcation on the part of the Department in fulfilling [its] responsibilit[ies]," *see* maj. op. at 166, and that the decrees do *not attempt to* "resolve particular questions of compliance and noncompliance," *id.* But I also believe that these decrees, as well as this court's unanimous 1973 *en banc* decision, envision that the District Court will review the particular resolutions that DE makes about fund recipient compliance, at least with regard to the states subject to those orders. *See* notes 59, 66–68, & 71–78 *supra* and accompanying text. I strongly disagree with the court's claim that review of the North Carolina settlement for consistency with the Department's own desegregation criteria would involve resolution of particular questions of compliance. Rather, District Court review of the Department's ac-

courts of this circuit contemplate that final Department action will be subject to judicial review in the court below. Moreover, it should also be clear that even if no prior orders had ever issued in this litigation, appellants would be entitled to the relief they requested. Section 603 unambiguously establishes a separate and enforceable right by which aggrieved persons may directly challenge allegedly arbitrary and capricious Department action in the venue of their choice. *See Cannon v. University of Chicago,* 441 U.S. 677, 695–697 & n. 21, 702–703 & n. 33, 99 S.Ct. 1946, 1957–1958 & n. 21, 1960 & n. 33, 60 L.Ed.2d 560 (1979); *Hills v. Gautreaux,* 425 U.S. 284, 286, 96 S.Ct. 1538, 1541, 47 L.Ed.2d 792 (1975). The Department's agreement to continue providing funds to the State of North Carolina is final agency action ripe for review, and the denial of appellants' request for relief, without considering its merits, deprives those litigants of their statutory right to judicial review in the forum of their choice.

For this court to deny appellants' request for relief, without considering its merits, the court must necessarily hold that Section 603 does not state a claim upon which the District Court could have based the requested relief. Appellants continually have urged that the District Court's jurisdiction

is "the very same jurisdiction that began this case; that the government is giving substantial federal funds to [North Carolina]." [86] This case began with appellants requesting, and the District Court granting, relief under Section 603 via six separate statutes, including the APA.[87] Appellants' 1981 motion for further relief invoked these same six jurisdictional bases, and dismissal is inappropriate if any of them state a cause upon which relief can be granted.[88]

Indeed, even if appellants' 1981 motion was somehow deficient, it cannot "be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts" that would support awarding the requested relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). A basic tenet of the modern rules of civil procedure is that courts must consider a request for relief if the plaintiff can succeed on *any* theory, whether advanced in the complaint or not.[89] Courts must always allow plaintiffs to amend their complaints appropriately,[90] and courts can deny plaintiffs this opportunity only if it appears to a certainty that they cannot state a valid claim.[91] Since Section 603 creates such a possibility, dismissal is appropriate only if it, independent

---

ceptance of that plan is the normal review that courts make of agency action.

**86.** *See* Transcript of June 25, 1981 Proceeding at 18, App. 23.

**87.** *See* note 53 *supra.*

**88.** A motion for further relief always relates back to the original pleadings. *See* Fed.R. Civ.P. 15(c); 6 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1474, at 383–384 (1971). This practice of relating back to prior pleadings explains why the District Court, in 1977, could provide plaintiffs with new and expansive relief, *see* notes 24–27 *supra* and accompanying text, on their simple motion for further relief, *see* note 22 *supra,* including ordering North Carolina's 1974 Plan revoked.

**89.** *Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1375 n. 5 (10th Cir.1979); *Bonner v. Circuit Court of City of St. Louis, Mo.,* 526 F.2d 1331, 1334 (8th Cir.1975), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1418, 47 L.Ed.2d 353 (1976); *United States v. Howell,* 318 F.2d 162, 166 (9th Cir.1963); *see generally* 5 C.

WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 601–602 (1969).

**90.** *Shapiro v. Secretary of State,* 499 F.2d 527, 534 & n. 25 (D.C.Cir.1974), *aff'd on other grounds sub nom. Comm'r v. Shapiro,* 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976); *Ballou v. General Electric Co.,* 393 F.2d 398, 399–400 (1st Cir.1968); *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir.1962); *McLaughlin v. Union Switch & Signal Co.,* 166 F.2d 46, 49 (3d Cir.1948).

**91.** *Stebbins v. Weaver,* 537 F.2d 939, 942 (7th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Bonanno v. Thomas, supra* note 90, 309 F.2d at 322; *Lone Star Motor Import, Inc. v. Citroen Cars Corp.,* 288 F.2d 69, 77 (5th Cir.1961). Since, save in extreme circumstances, it is unlikely that the court can determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim, it is wise to allow the amendment. *Schlesinger Investment Partnership v. Fluor Corp.,* 671 F.2d 739, 742 (2d Cir. 1982); *Austin v. House of Vision, Inc.,* 385 F.2d 171, 172 (7th Cir.1967).

of the prior orders of the courts of this circuit, does not state a claim upon which relief can be granted. But since Section 603 does state such a claim, this court and the District Court are in plain error.

### III. THE COURT'S VISION OF THE ENFORCEMENT SCHEME

Rather than read Section 603 by its plain terms to apply to "any [final] department or agency action," 42 U.S.C. § 2000d–2, the court offers a different vision of the Title VI enforcement scheme. In this vision persons aggrieved by the continued federal funding of allegedly discriminatory education programs may directly challenge only Department action (or inaction) that amounts to systemic defalcation of the Department's statutory responsibility. Maj. op. at 166, 168. Though the court does not have occasion to specify what Department decisions rise to the level of a general policy of abdication, see id. at 168, it is clear that once the Department initiates enforcement action against a particular fund recipient aggrieved persons cannot resort to Section 603 to vindicate their statutory rights. Id. Rather, in this vision, to bring a situation-specific complaint, aggrieved persons must resort to a Title VI suit against the fund recipient or to intervention in a suit brought by the fund recipient against the Department. Id. at 167,

168–170. Since appellants in this case did not resort to these more "normal" routes of judicial review, the court concludes that they have exhausted, by omission, all available avenues by which they could have obtained relief. Id. at 169 n. 38, 169–170. It therefore affirms their dismissal.[92]

In this part I examine the court's alternative vision of Title VI enforcement and the interpretive constructs it employs to erect this scheme. After analyzing—and rejecting—both this alternative scheme and the constructs upon which it is based, I then discuss the more difficult issue this appeal presents: whether the case has become moot. I conclude that the case has not become moot and therefore that appellants should be awarded appropriate relief.

### A. Title VI Suit Against Fund Recipient

Under the court's version of Title VI's enforcement scheme, the "primary mechanism" for judicial review of the Department's final decision to continue funding an allegedly discriminatory system of higher education "is a Title VI suit against the state itself." Id. at 167. Of course, the court does not cite to any statutory provision authorizing such a suit. Its omission is easy to explain: No such provision exists. I warmly welcome the court's suggestion that

---

**92.** Apparently, aggrieved persons can resort to § 603 for vindication of their statutory rights if the administrative proceedings culminate in a decision by the administrative law judge and that decision is adopted by the Department. See maj. op. at 168 & n. 36. But if the proceeding is cut short by a settlement between the Department and the fund recipient, aggrieved persons must resort to a Title VI suit against the fund recipient or to intervention in a suit brought by the fund recipient against the Department. Id. at 166 n. 30, 167, 168–170.

The court contends that interpreting § 603 in this manner will promote voluntary settlement of Title VI actions. See id. at 166–167 n. 32. I agree that voluntary compliance is to be encouraged, but I do not understand why "[e]xtending the Adams decree to the Department's decisions to settle, in contrast to permitting challenges to the settlement in an appropriate district court, would impede such voluntary settlements." Id. (emphasis in original). While I am no expert on bargaining theory, I

would think that review in one court—under the Adams decree—would have the same distractive effect on lawful settlement agreements as would review in another court—through a Title VI suit or intervention in a fund recipient suit against the Department. In either situation the Department has the same responsibility for enforcing the law and for seeking full compliance with it. In either case the fund recipient has the same duty to comply with Title VI and the same incentives to avoid that duty. And in either case the reviewing courts must be presumed to have the same dedication to enforcement of Title VI. See Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co., 342 U.S. 180, 183–185, 72 S.Ct. 219, 221–222, 96 L.Ed. 200 (1952). If the parties' incentives and the courts' responsibilities are the same in both forums, the probability of voluntary compliance should be the same, notwithstanding the forum in which review is to occur.

a private right of action exists; I too believe that private suits against fund recipients are an appropriate and essential mechanism for adequately enforcing Title VI.[93] But I must point out that a private action against a fund recipient is judicially implied, and a judicially implied action cannot displace an express statutory one.[94] Congress expressly contemplated that agency action would be the "primary mechanism" by which Title VI is enforced, see 42 U.S.C. § 2000d–1, and provided for review of that agency action through the traditional mode—the APA, see 42 U.S.C. § 2000d–2.[95] When the court substitutes its implied action against the fund recipient for Congress' express action against the Department, it abrogates this legislative scheme.

I applaud the court's approval of the dual enforcement mechanism that has evolved under Title VI. See maj. op. at 167–168 n. 35. But the court's vision of this dual enforcement scheme apparently is of a different sort from that conceived by other courts —most particularly the Supreme Court. See Cannon v. University of Chicago, supra, 441 U.S. at 703–708 & n. 41, 99 S.Ct. at 1960– 1963 & n. 41 (discussing interrelationship of private and public enforcement). These courts imply private suits against fund recipients to allow more direct and limited attacks on specific instances of discrimination.[96] Awarding individual relief often will efficiently remedy the injury suffered and obviate the need for upsetting the entire program being funded. Private suits thus allow the courts to work with the Department in promoting the orderly enforcement of the Act.

By contrast to private suits, public enforcement typically attacks the more systemic cases of racial discrimination, where broad restructuring of programs and institutions is often necessary for achieving Title VI compliance. The Department is em-

**93.** The Supreme Court has never expressly decided whether a private right of action against a fund recipient exists under Title VI. See Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (finding private right of action under Title IX and discussing such an action under Title VI); Regents of University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (assuming such action exists, but expressly not deciding the issue); Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1975) (action against local and federal government); Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1973) (assuming such action exists).

The various Courts of Appeals have been inclined to imply private rights of action against fund recipients. See, e.g., Drayden v. Needville Independent School District, 642 F.2d 129 (5th Cir.1981); NAACP v. Medical Center, Inc., supra note 56, 599 F.2d 1247; Bossier Parish School Board v. Lemon, 370 F.2d 847 (5th Cir.), cert. denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967).

**94.** To imply a private right of action, the court must apply the four factors identified in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The second of these four factors asks whether the legislature intended either to create or to deny a private right of action. Id. at 78, 95 S.Ct. at 2087. The fact that Congress expressly creates a remedy does not definitively answer the question whether a private right should exist, but it does require that any implied right be supplemental to, rather than a replacement for, the express remedy. Similarly, the third of the Cort v. Ash factors asks whether the implied remedy would be consistent with the legislative scheme. Id. Any judicial remedy that displaces an express statutory remedy must be inconsistent with the legislative scheme.

**95.** The proponents of Title VI stressed that the statute did not "confer sweeping new authority, of undefined scope, to Federal departments or agencies." 110 Cong.Rec. 6544 (1964) (remarks of Sen. Humphrey). Thus Title VI made federal action reviewable under the APA through § 603, and the Supreme Court and at least three other circuits have so interpreted the statute. See Cannon v. University of Chicago, supra note 93, 441 U.S. at 696–698 n. 21, 702–703 n. 33, 99 S.Ct. at 1957–1958 n. 21, 1960 n. 33; Montgomery Improvement Ass'n, Inc. v. U.S. Dep't of HUD, 645 F.2d 291, 292 (5th Cir.1981); Guardians Ass'n of NYC Police Dep't, Inc. v. Civil Serv. Comm'n of NYC, 633 F.2d 232, 261 n. 54 (2d Cir.1980), cert. granted on different issue, 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982); Shannon v. Dep't of HUD, 436 F.2d 809, 818–820 (3d Cir.1970); Southern Christian Leadership Conference, Inc. v. Connolly, 331 F.Supp. 940, 943 (E.D.Mich. 1971).

**96.** See, e.g., NAACP v. Medical Center, Inc., supra note 56; Uzzell v. Friday, 547 F.2d 801, aff'd en banc, 558 F.2d 727 (4th Cir.1977), vacated on other grounds, 438 U.S. 912, 98 S.Ct. 3139, 57 L.Ed.2d 1158 (1978).

powered to employ a variety of devices to end racial discrimination, including, where appropriate, termination of federal funds. Section 602 fund terminations are serious actions, however, and Congress consequently vested the Department with substantial discretion in making these decisions—subject only to limited APA review. *Id.* at 706–707 & n. 41, 712–714 n. 49, 99 S.Ct. at 1962–1963 & n. 41, 1965–1966 n. 49.[97] In recognition of the seriousness of such action, courts that imply private suits against fund recipients generally will not enjoin payment of federal funds.[98] Remedies of this sort are better left, as a first matter, to the expert decisionmaking of the Department, subject to limited review by the courts. But limited review does not mean, as this court asserts, *no* review; Congress enacted Title VI to channel, not unleash, agency discretion.[99]

There are, of course, federal funding statutes in which Congress knowingly commits certain decisions to unreviewable agency discretion. In these statutes Congress has limited the types of suits that private litigants can bring against federal enforcement agencies. For example, in the State and Local Fiscal Assistance Act, 31 U.S.C. §§ 1221–1265 (1976 & Supp. V 1981), Congress expressly provided for direct private actions against fund recipients and authorized federal courts to grant private litigants all appropriate relief, including "the suspension, termination, or repayment of funds." *Id.* § 1244. This court has interpreted these provisions to preclude certain situation-specific suits against the federal enforcement agency, the Office of Revenue Sharing. *See Council Of & For the Blind of Delaware Valley v. Regan,* 709 F.2d 1521 (D.C.Cir.1983) (*en banc*). The court decided that Congress meant to commit certain situation-specific decisions to agency discretion.[100]

The crucial issue for this court, in interpreting the State and Local Fiscal Assistance Act, was one of congressional design and intent. This is also the key issue in interpreting Title VI. But, as this court explicitly noted, Title VI and the State and Local Fiscal Assistance Act have categorically different enforcement schemes. *See id.,* 709 F.2d at 1531 n. 69 (majority opinion) (distinguishing *Adams v. Richardson*). Title VI is not a "no strings" grant scheme; the Department has a much larger staff than does the Office of Revenue Sharing; Title VI does not expressly provide for suits against the fund recipients; and Title VI does not explicitly empower a federal court to order, on its own initiative, suspension or termination of federal funds. *Id.* As this court stated, Congress knows how to create suits directly against a federal agency

---

**97.** The court notes that the Supreme Court has indicated that a "suit to compel the agency to investigate and cut off funds * * * is far more disruptive of [the Department's] efforts efficiently to allocate its enforcement resources * * * than a private suit against the recipient of federal aid could ever be." Maj. op. at 168 n. 35 (*quoting Cannon v. University of Chicago, supra* note 93, 441 U.S. at 707, 99 S.Ct. at 1963). This is undoubtedly true and explains both why Congress provided for only limited review of agency decisions and why private suits directly attacking the discriminatory activities are desirable. But it does nothing to counter the obvious: The Supreme Court has stated that aggrieved persons may resort to the APA to compel the agency to investigate and cut off funds. *Cannon v. University of Chicago, supra,* 441 U.S. at 707 n. 41, 99 S.Ct. at 1963 n. 41.

**98.** *See, e.g., NAACP v. Medical Center, Inc., supra* note 56; *but see Blackshear Residents*

*Org. v. Housing Authority of Austin,* 347 F.Supp. 1138, 1150 (W.D.Tex.1972).

**99.** *See* note 95 *supra; see generally* notes 55–59 *supra* and accompanying text.

**100.** The majority in *Council Of & For the Blind* decided that Congress precluded most situation-specific complaints against the enforcement agency. *See* 709 F.2d at 1524 (majority opinion). I still believe, as Chief Judge Robinson's partial dissent indicates, that an action could be maintained against the agency, as sole defendant, for refusing, in particular instances, to comply with the commands of the statute. *See* 709 F.2d at 1539–1540 n. 20 (Robinson, C.J., concurring in part and dissenting in part). Additionally, I endorse the dissent's conclusion that the State and Local Fiscal Assistance Act does not preclude a class action against the enforcement agency for systemic failure to observe the Act's directives. *See id.,* 709 F.2d at 1550–1552.

which has failed to carry out its statutory duties, *see id.,* and Title VI expressly contemplates situation-specific suits against the Department, *see* 42 U.S.C. § 2000d–2. Congress clearly intended that aggrieved persons have recourse—through the APA—against any allegedly arbitrary and capricious Department action.[101] Yet today's decision ignores the distinctions this court has previously drawn between Title VI and the State and Local Fiscal Assistance Act; it treats the two statutes as if they both expressly commit situation-specific decisions to Department discretion and require aggrieved persons to sue directly the fund recipients.

In ignoring Title VI's more important attributes, the court commits fund termination decisions almost completely to agency discretion and leaves aggrieved persons without a direct remedy against arbitrary and capricious Department action. To obtain judicial review the court instructs aggrieved persons to initiate a judicially implied action against the fund recipient, and not an APA action against the Department. It thereby substitutes its own vision of the ideal enforcement scheme for the one Congress expressly created in Sections 602 and 603. In so doing the court reverses the normal relations between legislature and court, wherein the legislature writes, and the court interprets, the law.

**101.** In enacting Title VI Congress was aware that private parties could initiate suits against state institutions receiving federal funds under 42 U.S.C. § 1983 (1976 & Supp. V 1981). *See, e.g.,* 110 Cong.Rec. 6545 (1964) (remarks of Sen. Humphrey). But Congress wanted the federal agencies to take the lead in enforcing nondiscrimination provisions against all institutions, private and nonprivate. *See id.* at 6544, 6546 (statements of Sen. Humphrey). Title VI made enforcement a mandatory responsibility of those agencies, *see* note 1 *supra,* and provided for traditional judicial review of federal agency action on this front, *see* note 58 *supra* and accompanying text. Thus Title VI, unlike § 1983, explicitly authorized private suits against federal officials, and implicitly authorized such suits against private officials.

**102.** The court admits that appellants met the prerequisites for jurisdiction and venue in the District Court. Maj. op. at 167 n. 34. But it contends that policies generally favoring

### B. *Justifying This Alternative Vision*

Because this alternative vision of the Title VI enforcement scheme does not flow from the statute itself, the court offers a series of policy arguments to justify its innovative construction of the Act. Not surprisingly, the court miscomprehends the interpretive constructs it offers. These constructs weigh in favor of, rather than against, recognizing the District Court's authority to provide limited review of Department compliance decisions with regard to particular states.

### 1. *Decentralizing judicial administration of Title VI.*

To begin with, the court boasts that its vision of the Title VI enforcement scheme will *decentralize* judicial administration of the Act. Maj. op. at 167. School systems who wish to challenge specific Department action and person aggrieved by allegedly discriminatory education programs will be able to sue only in the federal courts of the respective states. *Id.* at 167. By contrast, the court hyperbolizes, accepting appellants' proposed interpretation of Title VI would "vest in the federal courts of the District of Columbia plenary power to approve or disapprove the Department's Title VI decisions." *Id.* I do not find centralizing the judicial administration of Title VI as catastrophic as does the court,[102] but that

decentralization of lawsuits correctly informed the District Court's interpretation of what Title VI specifically authorizes that court to review. *Id.* I find none of these general policies particularly applicable to Title VI.

First, the court contends that trying the suit in the locality of the transaction will further "public participation in and the accountability of [the] judicial process * * *." *Id.* But the court cites no evidence that increased court attendance or third-party intervention will result from litigating the case closer to the affected citizens. This is, after all, a "lawsuit, not a town meeting." Sunstein, *Participation, Public Law, and Venue Reform.* 49 U.Chi.L.Rev. 979, 995–996 (1982).

Second, the court notes that there "is a local interest in having localized controversies decided at home." Maj. op. at 167. I do not dispute the legitimacy of this concern, but I question its relative importance in review of federal administrative action. In enacting Title

is really beside the point. The more important point is that Congress, not this court, is the body responsible for determining where Title VI claims will be litigated, and Congress has already done so—in our venue laws.

Our venue laws determine where lawsuits may be brought and ensure that proceedings are held in a convenient forum.[103] Historically, the venue laws have given plaintiffs, within certain prescribed limits, the choice among convenient forums, even if the forum ultimately chosen is markedly less preferable than some other forum.[104] This plaintiff orientation honors the time-accepted notion that plaintiffs should be masters of their own lawsuits [105] and thus

compensates them, at least in part, for their having to initiate these suits.[106]

Federal venue provisions follow these traditional principles, thereby reflecting the now conventional understanding that procedural rules ought to treat the government like any other litigant.[107] Federal venue laws provide that plaintiffs, at their option, can sue federal officers, employees, or agencies in any of three places: where the plaintiff resides, where the defendant resides, or where the cause of action arose.[108] Government agencies, like the Department, reside where they perform their official duties, usually the District of Columbia.[109] As a practical matter, then, the venue laws allow aggrieved persons, like appellants, to sue in

VI Congress concluded that a national standard is appropriate, and that conflicting preferences among local communities are, for the most part, immaterial. Under these circumstances, the court's role is to say what the national standard is, not to act as guardian of the interests of the local community. *See Steffel v. Thompson,* 415 U.S. 452, 464, 94 S.Ct. 1209, 1218, 39 L.Ed.2d 505 (1928) (federal government and federal courts primary "reliances" for protecting citizens against local discriminatory preferences); Sustein, *supra,* 49 U.Chi.L.Rev. at 983, 996–997.

Third, the court claims that "geographic dispersion of cases is one way to avoid excessive concentration of judicial power in a single tribunal." Maj. op. at 167. I suppose the concern here is that a risk of partisanship accompanies excessive concentration of power. But the court has not demonstrated that the District Court has shown unjustified partisanship for any party to this litigation. Moreover, to the extent there has been a concentration of power in the District Court, it has arisen because aggrieved persons have chosen to litigate there. That is a choice the venue laws give to them. *See* notes 107–112 *infra* and accompanying text.

**103.** 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3841, at 201 (1976).

**104.** *Id. See also* Sunstein, *supra* note 102, 49 U.Chi.L.Rev. at 980–981; Stevens, *Venue Statutes: Diagnosis and Proposed Cure,* 49 Mich.L. Rev. 307, 308–316 (1951).

**105.** Sunstein, *supra* note 102, 49 U.Chi.L.Rev. at 981.

**106.** Moore & Levi, *Federal Intervention: The Right to Intervene and Reorganization,* 45 Yale L.J. 565, 572 (1936). Thus I disagree with the court's assertion that the right of venue serves

"the roles of protecting defendants from the inconvenience and harassment of participating in trial far from home, and of assuring an appropriate distribution of cases among different tribunals." Maj. op. at 167 n. 34. While these considerations are factors to consider in assessing a *transfer* motion, the right of venue belongs, within certain prescribed limits, to plaintiff, and the burden is on defendants to show why there should be a change of forum. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *see also* 15 C. Wright, A. Miller & E. Cooper, *supra* note 103, § 3348, at 249–251. Indeed, defendants must show that the balance is strongly in their favor to obtain transfer. *Blake v. Capitol Greyhound Lines,* 222 F.2d 25, 27 (D.C.Cir.1955).

**107.** *See* J. Vining, Legal Identity 15, 17–18 (1978); Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1717–1718 (1975).

**108.** 28 U.S.C. § 1391(e) (1976) provides:

A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or any agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action. * * *

The provision authorizing venue where real property is situated has rarely been invoked in administrative law actions.

**109.** *See, e.g., Starnes v. McGuire,* 512 F.2d 918, 925 (D.C.Cir.1974); *Hartke v. FAA,* 369 F.Supp. 741, 746 (E.D.N.Y.1973).

the District Court for the District of Columbia if they so choose.[110] Therefore, if the District Court ends up reviewing many of the Department's enforcement actions around the country, it is only because aggrieved persons have properly exercised their statutory venue rights to sue in that court.[111] This choice is one that Congress has given them, and the court exaggerates the gravity of their exercising this option.[112]

Of course, I do not mean to imply that plaintiffs' control of the lawsuit is absolute. Any party can move for, or the District Court can *sua sponte* suggest, a transfer of an action to a clearly preferable forum.[113] Indeed, in *dismissing* the request for relief this court relies on many of the conceptual reasons that would justify *transferring* a case. *See* maj. op. at 164 & nn. 33, 34; *see also* note 102 *supra*. But neither the government nor the plaintiffs made a motion for transfer, and the District Court did not suggest one. The reality is that plaintiffs' motion for relief was not transferred: It was denied. The transfer provisions of the Judicial Code do not support such a denial; they were enacted precisely so that federal courts would not have to dismiss actions brought in proper, but inconvenient, forums.[114] 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3841, at 200–201 (1976). This court's resort to the considerations that underlie the appropriateness of transfer as support for dismissing this action turns those transfer provisions on their head.[115] It follows,

110. I should point out that prior to 1962 federal law provided for exclusive venue in the District of Columbia for suits against the federal government. *See* 28 U.S.C. § 1391(b) (1958) (current version at 28 U.S.C. § 1391(e) (1976). This provision was changed to *aid* plaintiffs. *See* Note, *Proper Venue for an Action When At Least One Defendant Is an Officer or Employee of the Federal Government*, 57 MINN.L.REV. 1005, 1007–1012 (1973).

111. Indeed, some statutes permit filing in the District of Columbia regardless of whether venue would otherwise be proper there. *E.g.,* 15 U.S.C. §§ 77vvv(a), 78y(a)(1), 80a–42(a), 80b–13(a) (1976) (Securities & Exchange Comm'n orders); *id.* § 2618(a)(1)(A) (Environmental Protection Agency regulations concerning toxic substances); 29 U.S.C. § 660(a) (1976) (review at behest of private litigants of orders of Occupational Safety & Health Review Comm'n); 49 U.S.C. § 1486(b) (1976) (Civil Aeronautics Board and Federal Aviation Agency orders).

112. When Congress wants to require litigants to bring their suits in the circuit where the subject matter of the regulation is located or where the effects of the regulation will be felt, it knows how to do so. *See, e.g.,* 33 U.S.C. § 921(c) (1976) (orders with respect to benefits under Longshoremen's and Harbor Workers' Compensation Act reviewable only in the circuit in which injury occurred).

113. *See* 28 U.S.C. § 1404(a) (1976) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.").

114. Prior to enactment of § 1404(a), federal courts dismissed actions brought in proper but inconvenient forums under the doctrine of *fo-*

*rum non conveniens. See, e.g., Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Koster v. (American) Lumbermen's Mutual Casualty Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Section 1404(a) was added to the Code to allow transfer of an action from a district or division in which venue had been properly laid to some other, more convenient, district or division. 15 C. WRIGHT, A. MILLER & E. COOPER, *supra* note 103, § 3481, at 200. Thus the court makes improper use of *Gulf Oil Corp. v. Gilbert, supra,* which § 1404(a) was designed to overcome, and *Liquor Salesmen's Union 2 v. NLRB,* 664 F.2d 1200, 1205 (D.C.Cir.1981), which dealt with *transfer,* not dismissal. *See* maj. op. at 167 n. 33.

115. Indeed, had either this court or the District Court conducted "the individualized, case-by-case consideration of convenience and fairness" that is prerequisite to a transfer—*much less to a dismissal*—they would have discovered that the District Court is as appropriate as any other forum for reviewing appellants' case. *See Van Dusen v. Barrack,* 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964). To begin with, it is plaintiffs' privilege to choose the forum and their preference must be given substantial weight in the transfer analysis. 15 C. WRIGHT, A. MILLER & E. COOPER, *supra* note 103, § 3848, at 243–245. A court cannot transfer simply because the defendant would prefer another forum or because the transaction involved arose elsewhere. *Id.* Second, plaintiffs' choice of the District Court evidences the convenience of this forum for them, and defendants' residence here is likewise evidence of its convenience for the government. The parties' convenience is always a factor to consider in the transfer analysis. *Id.* § 3849, at 251.

therefore, that the court's attempt to decentralize the judicial administration of Title VI amounts to a rewriting of our venue and transfer laws.

### 2. *Procedural balance among courts and parties.*

Next, the court asserts that its vision of the Title VI enforcement scheme appropriately reflects "the fundamental balance our rules of procedure strike * * * among the powers of coordinate federal tribunals and the rights of parties who are or ought to be before those tribunals." Maj. op. at 170. Appellants chose not to intervene in North Carolina's suit against the Department, and the authority they request the District Court to exercise now would require relitigation of many of the issues tried and rights decided in that litigation. By contrast, these "severe practical consequences" cannot arise in the court's scheme, where only one litigation of the issues is possible. *Id.* at 168–170 & nn. 38, 39. Again, the court argues by hyperbole and miscomprehends the interrelationship of the procedural constructs it relies upon.

a. *Mandatory intervention.* The starting point of the court's analysis is that parties with interests in related litigation *must* intervene to protect their rights. *Id.* at 169 n. 38, 169 n. 39. The court thus uses mandatory intervention (or collateral

estoppel) principles as its primary interpretive construct: Title VI should correspondingly be interpreted to preclude parties who deliberately bypass an opportunity at intervention from pursuing their rights in separate litigation against the Department. *Id.* at 171 n. 43.

But the basic procedural rule of preclusion dictates that only parties to prior actions are bound; nonparties are not bound. 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449, at 411 (1981). The basic rule of preclusion was first announced by Mr. Justice Brandeis in *Chase Nat'l Bank v. City of Norwalk,* 291 U.S. 431, 54 S.Ct. 475, 78 L.Ed. 894 (1934), where he stated:

> The law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger. * * * Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights.

*Id.* at 441, 54 S.Ct. at 479. For the last half century courts have faithfully followed this rule,[116] in recognition of the privilege that the law accords plaintiffs in their choice of forum,[117] the availability of mandatory joinder,[118] and the due process rights of the

---

Third, the administrative record and many of the relevant witnesses are here in the District of Columbia. The location of the record and the witnesses is a highly significant consideration. *Id.* § 3851, at 264. Fourth, though the desire to avoid multiple suits is another significant factor, "the existence of related cases is not conclusive and other aspects of the case may outweigh this element * * *." *Id.* § 3845, at 287.

I believe the other factors do outweigh this element, especially if we weigh in the fact that the District Judge has lived with this litigation for over a decade. *See* Note, *Venue for Judicial Review of Administrative Action: A New Approach,* 93 Harv.L.Rev. 1735, 1750–1757 (1980) (discussing importance of judicial expertise in making venue decisions with regard to administrative actions).

**116.** *E.g., Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 593, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974); *Zenith Radio Corp. v. Hazeltine Re-*

*search, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Gratiot County State Bank v. Johnson,* 249 U.S. 246, 249–250, 39 S.Ct. 263, 264, 63 L.Ed. 587 (1919); *Fabricius v. Freeman,* 466 F.2d 689, 693 (7th Cir.1972). The rule has been applied even in circumstances that offer little reason for duplicative litigation. *E.g., McGhee v. United States,* 437 F.2d 995, 1000 (Ct.Cl.1977); *State of Alaska v. Andrus,* 429 F.Supp. 958, 964 (D. Alaska 1977), *aff'd,* 591 F.2d 537 (9th Cir.1979).

**117.** *Consumers Union of U.S. v. CPSC,* 590 F.2d 1209, 1222–1223 (D.C.Cir.1978), *rev'd on other grounds,* 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980); *Pollard v. Roberts,* 283 F.Supp. 248, 254 (D.Ark.1968) (three-judge court), *aff'd per curiam,* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968).

**118.** *Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1222–1223; *McGhee v. United States, supra* note 116, 437 F.2d at 1000.

parties.[119]

Contrary to the court's starting proposition, our procedural rules do not require persons like the *Adams* plaintiffs to intervene in related litigation to protect their rights. The rules of intervention simply have not been drawn in compulsory terms.[120] Intervention is a device that permits, but does not require, nonparties to become parties to litigation that affects them. A few isolated decisions hold open the possibility that, in exceptional circumstances, a nonparty may be precluded for failure to exercise an intervention as of right.[121] But the overwhelming number of courts have decided to the contrary,[122] especially where consent judgments are involved.[123] And I know of no court that has precluded a party from relitigating a matter, as the court suggests today, *see* maj. op. at 168–169, because that party passed up an opportunity for permissive intervention.[124]

119. *Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1221–1223; *Morris v. Gressette,* 425 F.Supp. 331, 335 (D.S.C.1976) (three-judge court), *aff'd,* 423 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977).

120. *See* Fed.R.Civ.P. 24(a) (intervention of right) ("[u]pon timely application anyone shall be permitted to intervene"); Fed.R.Civ.P. 24(b) (permissive intervention) ("[u]pon timely application anyone may be permitted to intervene").

121. *See, e.g., Dennison v. City of Los Angeles Dep't of Water & Power,* 658 F.2d 694, 695 (9th Cir.1981) (rejecting nonparty union's attack on employer-minority employee consent judgment); *Culbreath v. Dukakis,* 630 F.2d 15, 22–23 (1st Cir.1980) (noting union trying to intervene could not collaterally attack employer-minority employee consent judgment); *Black & White Children of Pontiac School System v. School District of City of Pontiac,* 464 F.2d 1030 (6th Cir.1972) (*per curiam*) (rejecting attempt of opponents of school busing to attack collaterally a desegregation order); *O'Burn v. Shapp,* 70 F.R.D. 549, 552 (E.D.Pa.), *aff'd,* 546 F.2d 418 (3d Cir.1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977) (rejecting nonparty union's attack on employer-minority employee decree).

But these cases are the very narrow exception to the "general rule." 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4452, at 449 (1981). Cases like these usually involve additional elements—such as participation, representation, or special remedial schemes—that are specifically designed to foreclose nonparticipants. *Id.* at 449–451. Appellants share none of the elements that would allow a court to apply the exception to the general rule to them. *See* notes 128 & 129 *infra.*

122. *E.g., United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 845–846 & n. 21 (5th Cir.1975); *see also* notes 116–119 *supra.* For a comprehensive discussion of the general rule and the cases applying it, see 18 C. WRIGHT, A. MILLER & E. COOPER, *supra* note 121, § 4452, at 446–453.

123. A consent judgment is a compromise between two parties in a civil suit, the exact terms of which are fixed by negotiation between the parties and formalized by the signature of a federal judge. *See* M. GOLDBERG, THE CONSENT DECREE: ITS FORMULATION AND USE (Michigan State Bureau of Business & Economic Research, Occasional Paper No. 8, 1962), *quoted in* Flynn, *Consent Decrees in Antitrust Enforcement: Some Thoughts and Proposals,* 53 IOWA L.REV. 983–988 (1968). The central characteristic of such decrees is that the court has *not* resolved the substance of the issues presented. 18 C. WRIGHT, A. MILLER & E. COOPER, *supra* note 121, § 4443, at 383. To be sure, judicial approval may require some scrutiny of the fairness of the decree in light of its probable outcome. *United States v. City of Miami, Fla.,* 614 F.2d 1322, 1330–1331 (5th Cir.1980). But however close this examination may be, there still has been no actual litigation or contest on the merits. *See Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893–894 (2d Cir.1976) (collateral estoppel not appropriate because consent decree "not true adjudication[ ] of the underlying issues"); *United States v. Rexach,* 482 F.2d 10, 18–19 (1st Cir.), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973) (same); *Standard Oil Co. v. Ill. Central R. Co.,* 421 F.2d 201, 205 (5th Cir.1969) (same). Thus preclusion of nonparties is *never* appropriate. *See United States v. State of Louisiana,* 90 F.R.D. 358, 362–363 (E.D.La.1981) (persons not party to Title VI consent proceeding can challenge judgment in separate proceeding); RESTATEMENT (SECOND) OF JUDGMENTS § 68 (1970).

124. The decisions that do not preclude relitigation by nonparties who deliberately bypass intervention generally rely on the Supreme Court's decision in *Provident Tradesmen's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). In *Provident Tradesmen's* the Court had to decide whether a nonparty had such an interest in the pending case as to require *joinder* under Rule 19. In the course of assessing this question Justice Harlan noted that preclusion might extend to a person who "purposely bypassed an adequate opportunity to intervene" under Rule 24(a). *Id.* at 114, 88 S.Ct. at 740. But the Court express-

In point of fact, preclusion of nonparties for failure to intervene remains much more a creature of commentary than of cases. Some commentators have suggested that courts develop a new procedure to foreclose nonparties who have deliberately bypassed an opportunity to intervene. *See, e.g.,* Note, *Preclusion of Absent Disputants to Compel Intervention,* 79 COLUM.L.REV. 1551 (1979); Comment, *Nonparties and Preclusion by Judgment: The Privity Rule Reconsidered,* 56 CAL.L.REV. 1098, 1122–1132 (1968). But the more experienced and thoughtful commentators note that the interests "sought to be served are better protected by mandatory joinder procedures." 18 C. WRIGHT, A. MILLER & E. COOPER, *supra,* § 4453, at 453; *accord,* McCord, *A Single Package for Multiparty Disputes,* 28 STAN. L.REV. 707, 723–724 (1976). Thus Professors Wright, Miller, and Cooper concluded:

It is conceivable that some day this basic postulate may be eroded by courts that believe that one full and fair litigation of an issue is sufficient without regard to the identity of the parties. It is much better, however, to resist any such erosion. Our deep-rooted historic tradition

that everyone should have his own day in court draws from clear experience with the general fallibility of litigation and with the specific distortions of judgment that arise from the very identity of the parties. * * *

18 C. WRIGHT, A. MILLER & E. COOPER, *supra,* § 4449, at 416–417 (footnote omitted).

The designers of Rule 19 of the Federal Rules of Civil Procedure dealt with this very problem (of relitigating issues previously decided) when they created the concept of mandatory joinder.[125] They put the burden on existing parties and the court to bring in those whose presence would be necessary and desirable to a just adjudication; they also required these parties and the court to work out a fair solution when joinder is not jurisdictionally possible.[126] This court's notion that one who bypasses an opportunity at intervention should be precluded abrogates Rule 19 and its purpose completely. It is the parties'—not the nonparties'—responsibility to make certain that the court has before it all those needed to enable it to serve the ends of justice.[127]

---

ly refused to decide this issue, *see id.,* and has yet to return to it. *See* 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1608, at 76 & n. 10 (1972 & 1982 Pocket Part).

Nevertheless, a few courts have precluded nonparties for failing to exercise an intervention as of right. *See* note 121 *supra.* But none have suggested precluding a party who purposely bypasses an opportunity at permissive intervention. Yet the court takes that step today. *See* maj. op. at 168–169. Thus today's decision goes beyond what any other court has held and has absolutely no relation to Justice Harlan's suggestion in *Provident Tradesmen's.* The court's analysis would preclude a nonparty from relitigating an issue where that party could have moved to intervene, even though a court, under Rule 24(b), could have denied that motion for intervention. This additional step is absolutely unprecedented and, in my view, totally indefensible.

**125.** *See Provident Tradesmen's Bank & Trust Co. v. Patterson, supra* note 124, 390 U.S. at 120, 88 S.Ct. at 743; *Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1220. *See generally* Advisory Committee's Note to Fed.R. Civ.P. 19, *reprinted at* 39 F.R.D. 89, 92 (1966).

**126.** *See Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1223; *Ricci v. State*

*Board of Law Examiners,* 569 F.2d 782, 784 (3d Cir.1978); Fed.R.Civ.P. 19(a).

**127.** The danger of applying collateral estoppel for failure to intervene is especially heightened in cases like this one, where the statute involves federal funding and a nondiscrimination proscription. When one party (*e.g., Adams*) seeks to get the federal agency to enforce the nondiscrimination proscription, another party (*e.g.,* the State of North Carolina) will be seeking to obtain funding without complying with the nondiscrimination proscription. The latter party may stay out of the litigation initiated by the former—as North Carolina did in 1977— and file suit against the government in another jurisdiction—as North Carolina did in 1979. The approach the court adopts today places the initial plaintiffs in an intractable dilemma whenever the government is derelict in its duty to enforce the law. If they do not intervene and the government does not contest the entry of an inadequate judgment, the initial plaintiffs risk being collaterally estopped in the venue where they originally brought suit. If they do intervene, they risk losing the right to litigate in the forum of their choice and will be relegated to litigating in an inconvenient and less preferable forum. Both options are, of course, entirely unsatisfactory to the initial plaintiffs, and leave

The *Adams* plaintiffs appeared only as *amicus curiae* in the North Carolina litigation.[128] They purposefully chose not to intervene, and neither the State of North Carolina, the government, nor the court attempted to join them.[129] If, as the government and this court now assert, the proposed settlement so affected appellants' rights that they should be barred from litigating in the District Court here, then the proposed settlement certainly could have been said, in the words of Rule 19, "as a practical matter [to] impede [their] ability to protect that interest or * * * [to] leave [the Department] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of [appellants'] claimed interest."[130] Thus, under the scheme Rule 19 creates, North Carolina cannot validly object to relitigation of the proposed settlement's merits "for clearly the plaintiff [in the earlier suit], who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtain[ed] against them."[131] Nor can the Department legitimately bemoan the threat of inconsistent obligations since it never attempted to foreclose that possibility by seeking to join appellants in the North Carolina litigation.[132] Rule 19 makes the "severe practical consequences" that concern this court North Carolina's and the government's responsibility, not appellants'.[133]

128. It is clear that appearance as *amici* does not rise to the level of participation necessary for preclusion. *See, e.g., Munoz v. County of Imperial,* 667 F.2d 811, 816 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982); *TRW, Inc. v. Ellipse Corp.,* 495 F.2d 314, 318 (7th Cir.1974).

Nor is this a special remedial scheme designed to foreclose nonparticipants. Such schemes usually involve bankruptcy, reorganization, or probate matters. *See* 18 C. WRIGHT, A. MILLER & E. COOPER, *supra* note 121, §§ 4452, 4458, at 451, 520–521. The litigation precluded in these schemes is sequential private enforcement, not litigation directed toward the adequacy of the government's initial enforcement efforts. *Id.* at 520.

129. Though the government may represent private parties in a judicial proceeding, their adequate representation "must be determined as a matter of substance and not mere form." *Chicago, Rock Island & Pacific R. Co. v. Schendel,* 270 U.S. 611, 618–620, 46 S.Ct. 420, 423, 70 L.Ed. 757 (1926). Preclusion must be denied where plaintiffs allege that the government has been derelict in fulfilling its duties or where the agency's institutional predelictions conflict with those of the grievants. *See Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1217–1218; *Defenders of Wildlife v. Andrus,* 77 F.R.D. 448 (D.D.C.1978); *Robertson v. Dep't of Defense,* 402 F.Supp. 1342, 1346–1347 (D.D.C.1975). Appellants have challenged DE's enforcement efforts for over a decade, and it belies reality to presume, in an action challenging yet another DE enforcement effort, that DE has adequately represented them in the action they are challenging.

them at a significant disadvantage to those with whom the government refuses to seek, or settles for less than, full compliance with the law.

130. Fed.R.Civ.P. 19(a).

131. *Provident Tradesmen's Bank & Trust Co. v. Patterson, supra* note 124, 390 U.S. at 111, 88 S.Ct. at 738; *Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1221–1222; *see Boles v. Greeneville Housing Authority,* 468 F.2d 476, 479 (6th Cir.1972) ("[a]ny hardship suffered * * * is attributable to [the party's] own failure to bring [an interested person] into the case as a party").

132. *Consumers Union of U.S. v. CPSC, supra* note 117, 590 F.2d at 1222; *see Provident Tradesmen's Bank & Trust Co. v. Patterson, supra* note 124, 390 U.S. at 110, 88 S.Ct. at 738 ("After trial, however, if the defendant has failed to assert this interest [against inconsistent relief], it is quite proper to consider it foreclosed.").

133. The court responds to this argument by asserting that "the *Adams* plaintiffs were not persons 'subject to service of process' by [the North Carolina] court and therefore could not meet the elementary requirement for joinder" set out in Rule 19. Maj. op. at 169 n. 39. This assertion is flawed both factually and conceptually.

Factually, the *Adams* plaintiffs voluntarily appeared as *amicus curiae* in the North Carolina litigation, and they contested both the court's statutory jurisdiction and the merits of the proposed settlement. By voluntarily appearing as *amicus,* the *Adams* plaintiffs subjected themselves to the North Carolina court's jurisdiction over the person and, concomitantly, its process. *See Lone Star Motor Import, Inc. v. Citroen Cars Corp., supra* note 91, 288 F.2d at 73 n. 3; *Revies v. Loyd,* 205 F.Supp. 441, 443–448 (W.D.La.1962). Immunity from process is waived if not timely asserted by the

In sum, joinder principles, not mandatory intervention principles, strike the primary procedural balance among the powers of coordinate courts and the rights of parties who are or ought to be before those tribunals. These joinder principles would not condone preclusion of parties who do not intervene in related litigation; hence, they certainly do not justify the court's innovative construction of the Title VI enforcement scheme.

b. *Indispensable parties.* As a corollary to its mandatory intervention construct, the court asserts that coordinate courts may not grant relief that would undermine the rights that absent parties have in the judgment of another court. Maj. op. at 170–171. The court thus uses indispensable party principles as a second interpretive construct: Title VI should be interpreted both to protect the rights North Carolina gained in its consent judgment and to prohibit collateral attack on those rights in a forum from which North Carolina is absent.

*Id.* Again, I think the court misapplies indispensable party principles in reaching these conclusions.

As to the undermining of North Carolina's interest in the consent judgment, I have already demonstrated that Rule 19 places the burden on the parties, not the non-parties, to protect rights so acquired.[134] Even assuming that the North Carolina court had jurisdiction to entertain the proposed consent decree, its judgment is binding, in a procedural sense, only on those persons officially named as parties to the action. Rule 19 creates a mechanism by which parties like North Carolina can protect their interests, but to receive its protections "the parties must act for themselves." 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1609, at 92 (1972).[135] Since North Carolina did not invoke the Rule 19 procedure for avoiding successive lawsuits, it cannot validly object to appellants' subsequent challenge to its Title VI settlement agreement.[136]

party claiming it, *Schwarz v. Thomas,* 222 F.2d 305 (D.C.Cir.1955), and the *Adams* plaintiffs have never requested immunity by special appearance. In any event, courts grant immunity only if it serves their convenience, *Lamb v. Schmitt,* 285 U.S. 222, 52 S.Ct. 317, 76 L.Ed. 720 (1932), and will not do so if a party is needed, in the Rule 19 sense, for a full and complete adjudication. 2 J. MOORE, FEDERAL PRACTICE ¶ 4.20, at 4–177 (1982). If the *Adams* plaintiffs' interests were so related to the government's and North Carolina's interests that they could be barred from pursuing their rights elsewhere, the North Carolina court could not, in good conscience, have granted them immunity. Indeed, since they participated as *amicus* on the merits, they can be deemed to have generally appeared, irrespective of whether they asserted immunity. *Jos. Riedel Glass Works, Inc. v. Keegan,* 43 F.Supp. 153 (S.D. Maine 1942).

Conceptually, the structure of Rule 19 indicates that a court must *first* determine the extent of the absent person's interest, and only *then* decide whether he is subject to service of process. 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1604, at 43 (1972). If a necessary person is not subject to process, and therefore cannot be joined, then the court *must* also conduct the Rule 19(b) analysis to determine whether in "equity and good conscience" the action can proceed in that person's absence. *Id.* at 45. Thus, even if the *Adams* plaintiffs were not subject to service of proc-

ess, Rule 19 indicates that the court must ask them to appear, determine whether the case can be transferred to a forum where they would be subject to process, and further determine, on the record, whether the action can proceed without them. *Id.* § 1608, at 71. Since the parties did not ask the North Carolina court to make these judgments, and the court did not make them *sua sponte,* appellants cannot be prejudiced by the North Carolina litigation.

Finally, I question the court's premise that none of the *Adams* plaintiffs were citizens of North Carolina when the litigation was pending. Appellants joined *additional* North Carolina citizens in November 1982 to cure any *possible* defect that might exist in their 1982 lawsuit. There is nothing in the record to show that there were no representative plaintiffs from North Carolina in the class at the time the North Carolina litigation was pending.

134. *See* notes 126–131 *supra* and accompanying text.

135. By contrast, the right of intervention is permissive; it allows a party to include himself in litigation at his option. There is no prejudice from a failure to assert and state this permissive right. *See* notes 116–124 *supra* and accompanying text.

136. The court's only response to this reading of Rule 19 is that the North Carolina court had no

As to requiring "the state [to] be before a federal court in the District of Columbia—which it is not," Maj. op. at 171, I agree that North Carolina's interest in the consent judgment is so related to the subject matter of this action that any disposition in its absence "may * * * impair or impede [its] ability to protect that interest." Fed. R.Civ.P. 19(a). But being a party to be joined if feasible does not give North Carolina an unqualified right to prevent this litigation from going forward. Indeed, Rule 19(a) counsels the exact opposite result.[137] It instructs the parties and the court to join North Carolina to the litigation. *Id.* But appellants' motion was dismissed before there was any consideration, by the parties or the court, of interests so related to the subject matter of the action that joinder might be necessary. This court has no business affirming the District Court's dismissal because it independently believes that North Carolina would object to, and successfully defeat, an attempt to join it as a party. Rather, this court should remand to the District Court with instructions that it make the attempt at joinder.

In any event, the absence of a party to be joined if feasible does not automatically require a court to dismiss the action before it. Rather, Rule 19(b) requires the court to "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." FED.R.CIV.P. 19(b); *see Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington,* 699 F.2d 1274, 1276–1277 (D.C.Cir.1983). Rule 19(b) in-

structs the court to consider, *inter alia,* the following factors in making this equitable determination:

[F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19 does not indicate what weight is to be given to each factor; rather, the District Court must make this assessment on the facts of each case and in light of the governing "equity and good conscience" test. 7 C. WRIGHT & A. MILLER, *supra,* §§ 1604, 1608, at 45–46, 66. "A district judge, 'closer to the arena,' is often better situated than is an appellate panel 'to survey the practicalities involved in the litigation,'" *Cloverleaf Standardbred Owners Ass'n Inc. v. Nat'l Bank of Washington, supra,* 699 F.2d at 1277, and the operation of Rule 19 depends, to a substantial degree, on the careful exercise of the District Court's discretion. *Id.*

Were the District Court to weigh the Rule 19(b) factors, it might well conclude that the action could proceed among the parties before it. Even if we assume that any adverse judgment would prejudice North Carolina,[138] the other three factors, which are just as important, might lead the District Court to determine that the action

---

personal jurisdiction over the *Adams* plaintiffs and therefore that North Carolina could not have asked the court to join them. Maj. op. at 171 n. 42. But the court clearly had personal jurisdiction and, even if it did not, Rule 19 requires a much more detailed analysis before a court can proceed without a party needed for a just adjudication. *See* note 133 *supra.*

**137.** Rule 19(a) states that if a party objects to joinder or refuses to be joined on jurisdictional grounds, then "he shall be dismissed from the action." Fed.R.Civ.P. 19(a). Federal courts will then dismiss for nonjoinder only when the defect cannot be cured and serious prejudice or

inefficiency will result. 7 C. WRIGHT & A. MILLER, *supra* note 124, § 1609, at 83. The rule places the court under an obligation to seek an alternative—like transfer—to dismissal. *Id.* § 1608, at 71.

**138.** In principle, I agree with the court that the essence of appellants' claims—a determination that North Carolina's settlement does not constitute compliance with Title VI—is inherently prejudicial to North Carolina now that it has the consent judgment. *See* maj. op. at 171 n. 42. I would point out, however, that this consent judgment is little more than a judicially sanctioned contract.

could proceed. For one thing, the court can take measures that will lessen or avoid the prejudice to North Carolina.[139] For example, it can encourage North Carolina to appear on a voluntary basis to protect its rights.[140] An indispensable party's refusal to join, when requested, is "pertinent to the issue of maintaining the action * * *." Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 HARV.L.REV. 356, 366 (1967). *See also* 7 C. WRIGHT & A. MILLER, *supra*, § 1608, at 74–76. For another thing, "a judgment rendered in [North Carolina's] absence will be adequate * * *."[141] An order requiring the Secretary to resume the administrative proceeding will once again put the Department back on the track toward vindication of plaintiffs-appellants' civil rights. Finally, we can only speculate as to whether appellants "will have an adequate remedy if the action is dismissed for nonjoinder" of the absentee. Fed.R.Civ.P. 19(b). Appellants can seek post-judgment intervention in the North Carolina court, but we cannot be sure the motion would be granted.[142] In sum, the District Court, in implementing the "equity and good conscience" test, might very well find that an action could go forward, even in North Carolina's absence. But the more important point, for my purposes now, is that either the District Court or this court must *actually* balance those factors to determine whether the action should proceed in North Carolina's absence.[143]

In short, indispensable party principles do not make inviolable the rights of absentee parties. Rather, they strike a balance between the rights of those who are or ought to be before the court and they provide a mechanism by which the parties can assure themselves of an adjudication on the merits. Indispensable party principles do not *a priori* preclude litigation in the District Court because North Carolina is absent; hence, they do not justify the court's restructuring of the Title VI enforcement scheme.

### 3. Recognizing North Carolina court's judgment.

Implicit in the court's *post hoc* concern for judicial decentralization and for procedural balance is an over-arching canon of interpretation: A statute should not be read to place coordinate federal courts in the position of disregarding each other's judgments. *See* Maj. op. at 170–171. Since the North Carolina court has already exercised jurisdiction over the proposed set-

---

**139.** The prejudice to be lessened or avoided is *not* the undermining of North Carolina's interests, but the encroachment on North Carolina's interests in its absence. *See* 7 C. WRIGHT & A. MILLER, *supra* note 124, § 1608, at 70–76.

**140.** *See* Advisory Committee's Note to Rule 19, *reprinted at* 39 F.R.D. 89, 92 (1966).

**141.** Fed.R.Civ.P. 19(b). Adequacy of the relief refers to the ability of the defendant to make the plaintiff whole in the necessary party's absence. *See* 7 C. WRIGHT & A. MILLER, *supra* note 124, § 1608, at 77–78.

**142.** As the court notes, *see* maj. op. at 169 n. 39, intervention may be granted solely to enable the intervenor to appeal. *See, e.g., Smuck v. Hobson*, 408 F.2d 175 (D.C.Cir.1969). Whether the application would be granted is, of course, a question for the North Carolina District Court, and the Fourth Circuit on appeal, to consider in their sound discretion. *See* 7A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1916, at 572–584 (1972). Timeliness would be evaluated in the light of all circumstances in the case, *see id.* at 574, including appellants' reasonable and vigorous efforts to pursue their rights in the courts of this circuit. But since it is pure speculation as to whether the application would be granted, the District Court here must show extra sympathy for plaintiffs-appellants' remedial rights in evaluating whether to continue the action. *Id.* § 1608, at 81.

**143.** I recognize, as has this court, *see Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington*, 699 F.2d 1274, 1277 n. 5 (D.C.Cir.1983), that "there are cases in which Rule 19 does not figure in a district court's decision but becomes an issue on appeal in conjunction with a jurisdiction or venue challenge pursued by one or more of several defendants. In such cases, the court of appeals may independently apply Rule 19 or it may remand to the district court for initial consideration of the Rule's application." *Id.* But the preference is to remand to the district court for it to exercise its discretion and to balance properly the competing equities under Rule 19(b). *Walsh v. Centeio*, 692 F.2d 1239, 1241 (9th Cir.1982).

tlement agreement, the court reads Title VI (and the prior orders issued in this litigation) to preclude review in the District Court for the District of Columbia. *Id.* I have already demonstrated that transfer and joinder devices adequately resolve the problem of coordinate courts exercising conflicting jurisdiction, and hence I see no reason for elevating this concern into a canon for interpreting statutes. But I find such interpretive posturing especially galling in this case because it vests statutory authority to review Department settlement agreements in the *wrong* District Court.

Section 603 authorizes judicial review of Department action in two distinct fashions. First, it permits aggrieved persons to challenge Department action to the extent that the APA allows. 42 U.S.C. § 2000d–2. Thus persons allegedly wronged by the distribution of federal funds to state systems can challenge the Department's acceptance of a desegregation plan as "final agency action" which "aggrieves" or "adversely affects" them within the meaning of the APA. 5 U.S.C. § 702 (1976); *see generally* 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 24.1–24.12, 25.6–25–13 (2d ed. 1983). Second, Section 603 *independently* authorizes any aggrieved person to seek judicial review *after* the Secretary has made a "final" finding of failure to comply with Title VI. Thus, if upon review of the administrative record, the Secretary makes a "final" decision that the recipient has not complied and that funds should therefore be terminated, the recipient becomes "aggrieved" and may seek judicial review. 42 U.S.C. § 2000d–2. Likewise, if the Secretary makes a "final" decision of noncompliance and refers the case to the Justice Department for enforcement, the United States becomes "aggrieved" within the meaning of Section 602, *id.* § 2000d–1, and

can seek judicial review. *Id.* § 2000d–2. But *before* the Secretary makes a "final" decision of noncompliance, potentially adequate administrative remedies remain, and neither the United States nor the fund recipient are "aggrieved" or "adversely affected" within the meaning of Title VI or the APA. *See Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); 4 K. DAVIS, *supra,* §§ 24.2, 25.15. Hence, if the Secretary accepts a desegregation plan prior to making a "final" finding of noncompliance, neither he nor the fund recipient can seek review of that plan in a federal court: They do not have "adverse" interests and there is no statutorily ripe claim to present to a court. *See Taylor v. Cohen,* 405 F.2d 277, 280 (4th Cir.1968) (*en banc*); *School District of Saginaw v. U.S. Dep't of HEW,* 431 F.Supp. 147, 153–155 (E.D.Mich.1977); *Board of Education of Cincinnati v. Dep't of HEW,* 396 F.Supp. 203, 248 (S.D.Ohio 1975).

In this case the Department aborted the administrative hearing, accepted a proposed desegregation plan, and continued to distribute federal funds. The Secretary has never made a "final" finding of noncompliance. Under the terms of the statute, neither the State of North Carolina nor the Department should have been able to seek review of that plan in the North Carolina court. Nor could that court have reviewed the plan as part of the lawsuit that the State of North Carolina filed in 1979; all justiciable issues in that controversy had already been decided,[144] and the only possible controversy remaining—a termination of funds at the end of the administrative proceeding—was entirely hypothetical and speculative in 1981. *See Board of Education of Cincinnati v. Dep't of HEW, supra,* 396 F.Supp. at 247–249. Claims based on wholly speculative events are not justicia-

---

**144.** In that suit North Carolina complained that HEW's enforcement of Title VI deprived the state and its citizens of their constitutional rights and further asked that the court declare the university system to be in compliance with Title VI. *See* note 42 *supra.* North Carolina

also moved to restrain HEW from conducting the administrative proceeding and from imposing any fund deferral during the hearing. Deferral was enjoined, all other relief denied, and no justiciable claim for relief remained for fu-

ble,[145] especially when administrative proceedings are involved.[146] In short, the North Carolina court had no lawsuit over which to retain jurisdiction and no statutory basis for entertaining the proposed decree.

Ironically, prior to submitting the North Carolina plan to the North Carolina court, the Department apparently had never before sought a court's imprimatur on a voluntary desegregation plan, though it had accepted hundreds of such plans in settlement of Title VI actions.[147] It had recognized that Title VI did not authorize such review and that "enforcement of [the statute] would be irreparably undermined if a recipient of funds could routinely bypass statutorily mandated administrative compli-

ance proceedings by the expedient of filing a lawsuit and then obtaining a substantive consent decree * * *." [148] The North Carolina court's exercise of jurisdiction in this case thus violates the statutory enforcement scheme. While we have no authority to set its void judgment aside, we must ignore it if we are to implement effectively the law as Congress has written it.[149] Title VI did not place this court in the unenviable position of *disregarding* the North Carolina court's judgment; rather, it was the Department and the State of North Carolina that did so. At the time the Secretary accepted the settlement, jurisdiction was statutorily proper only in the forum of appellants'—the "aggrieved" and "adversely affected" persons'—choice.[150]

ture disposition. *See State of N.C. v. Dep't of HEW,* 480 F.Supp. 929 (E.D.N.C.1979).

**145.** *See Communist Party of U.S. v. Subversive Activities Control Board,* 367 U.S. 1, 79, 81 S.Ct. 1357, 1401, 6 L.Ed.2d 625 (1961); *Diebold v. Civil Service Comm'n,* 611 F.2d 697, 700 (8th Cir.1979); *Halleck v. Berliner,* 427 F.Supp. 1225, 1250–1251 (D.D.C.1977).

**146.** A court will not decide issues that would require it "to speculate as to events in the future which may never materialize." *Southeastern Pennsylvania Transportation Authority v. ICC,* 644 F.2d 253, 262 (3d Cir.1981). Thus courts will not intrude upon agency administrative proceedings, which must complete their course before injury can be asserted in court. *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). This established rule encompasses all of the claims that North Carolina made in 1979, and their resolution must await "final administrative action and judicial review in the manner prescribed by Congress." *Taylor v. Cohen,* 405 F.2d 277, 282 (4th Cir.1968) (*en banc*); *Wolf Corp. v. SEC,* 317 F.2d 139, 142 (D.C.Cir.1963).

**147.** *See* post-argument memorandum of plaintiffs-appellants at 5.

**148.** *See* Letter, *supra* note 37, at 1, App. 108. *See also* note 38 *supra* and accompanying text.

**149.** The judgment is void for lack of quasi-jurisdictional fact: the circumstances that would have made either North Carolina or the Department an "aggrieved party" within the meaning of §§ 601–603 or the APA. *See* 7. J MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 60.25[2] (2d ed. 1982) (discussing effects of void judgments). A void judgment of this type is sub-

ject to direct attack, but not collateral attack, by the parties. *Id.* Nonparties, of course, are not bound at all, and may pursue their claims in any court of competent jurisdiction and venue. *Id.; cf. Windsor v. McVeigh,* 93 U.S. (3 Otto) 274, 283–284, 23 L.Ed. 914 (1876) (a judgment by a court having jurisdiction over both subject matter and the parties is void if the action would constitute a denial of due process).

We sit only to review the District Court sitting in our circuit, and hence cannot vacate the North Carolina court's judgment. *See* 28 U.S.C. § 1294(1) (1976). But the validity of that judgment can be relitigated in our forum. *See* 7 J. MOORE & J. LUCAS, *supra,* ¶ 60.25[3].

**150.** The government cries wolf when it asserts that an "expansive view of the district court's jurisdiction in *Adams* would cast doubt on the finality of any Title VI settlement agreed to by the government * * *." Supplemental brief of appellees at 15. To begin with, this lack of finality is not different from that which exists with informal settlements under any other statute. Second, Title VI itself provides the terms by which finality is achieved: first, a statutorily aggrieved person brings suit under § 603; and second, the educational agency brings itself into compliance with the desegregation order that arises from that § 603 suit. *See* 42 U.S.C. § 2000d–5.

But § 2000d–5 is inapplicable to the present case because the North Carolina court lacked authority under § 603 to issue any desegregation order. In the case of North Carolina the Department never made a final finding of noncompliance or ordered the termination of funds. Hence there is no statutorily aggrieved party. By contrast, for example, the education settlement negotiated with the State of Louisi-

## C. *Mootness on Appeal*

Rather than erect an alternative vision of the enforcement scheme and justify it through these misconceived interpretive constructs, the court would do better to recognize the District Court's statutory jurisdiction and to face, head on, the more difficult issue that this appeal presents: whether the action is moot on appeal. Appellants sought to enjoin the Secretary from accepting the North Carolina plan as constituting compliance with Title VI, but the Secretary has since accepted the plan and successfully submitted it to the North Carolina court in the form of a consent decree. Thus the action sought to be prohibited has been consummated and the appeal is arguably moot. *See Jones v. Montague,* 194 U.S. 147, 24 S.Ct. 611, 48 L.Ed. 913 (1904). Indeed, many of the "severe practical consequences" that bother this court—*e.g.,* its repeated references to lack of effectual relief, *pro forma* gestures, and lack of a case or controversy—indicate that mootness concerns underlie much of today's decision. *See* maj. op. at 170–171.

But this case is not moot. Mootness prevents a court from deciding a controversy only if no relief whatever can be granted. The Supreme Court has enunciated the precise principle as follows:

> [W]hen, pending an appeal from the judgment of a lower court, and *without any fault of the defendant,* an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him *any effectual relief whatever,* the court will not proceed to a formal judgment, but will dismiss the appeal. * * *

*Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895) (emphasis added).

Thus the proper issue on appeal is whether appellants can be granted "any effectual relief whatever." Here, to be sure, the only relief *requested* was an injunction. Nonetheless, it "has long been established law that, in equity, a plaintiff is entitled to any relief appropriate to the facts alleged in the bill and supported by the evidence, even where he has not prayed for such relief." *Dann v. Studebaker-Packard Corp.,* 288 F.2d 201, 216 (6th Cir.1961). *E.g., Bemis Brothers Bag Co. v. United States,* 289 U.S. 28, 34, 53 S.Ct. 454, 456, 77 L.Ed. 1011 (1933); *Lockhart v. Leeds,* 195 U.S. 427, 437, 25 S.Ct. 76, 79, 49 L.Ed. 263 (1904). *See* Note, *Mootness on Appeal in the Supreme Court,* 83 Harv.L.Rev. 1672, 1676–1677 & n. 26 (1970). Moreover, the Federal Rules specifically provide that a party is entitled to all appropriate relief, whether requested or not, if the equities favor it, *see* Fed.R.Civ.P. 54(c).

In this case the action that allegedly moots the appeal came at the Secretary's behest: He accepted the proposed settlement and submitted it to the North Carolina court. To dismiss for mootness would set the unacceptable precedent that defendants who are subject to possible injunctive relief (and who prevail in the District Court) can moot subsequent appeals by taking the action sought to be prohibited while the appeal is pending. Nor can the North Carolina court's acceptance of the proposed decree moot this appeal: neither collateral estoppel nor comity principles bind nonparties or affect the relief available to them. *See* Maj. op. at 169 n. 39; *Consumers Union of U.S. v. CPSC,* 590 F.2d 1209, 1217–1219 (D.C.Cir.1978), *rev'd on other grounds,* 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980). In sum, appellants should not be prejudiced by the Secretary's actions and the equities favor shaping unrequested relief for their benefit.

Therefore, I would remand this case to the District Court for a decision on the

ana, which has been approved by a three-judge district court, *see United States v. State of Louisiana, supra* note 57, 527 F.Supp. 509, arose out of a § 603 suit: The Department exhausted its § 602 efforts, made a final finding of noncompliance, and referred the case to the Justice Department to obtain the termination of funds. The Justice Department, as the government's prosecutorial arm, then filed a § 603 suit and vigorously litigated the matter for seven years. Because the Department made the "final" finding of noncompliance, the United States became a statutorily aggrieved person.

merits. If the District Court were to find that the Department acted arbitrarily and capriciously in ignoring its own desegregation criteria, I would have it order the Department to resume the public enforcement process condition precedent to a termination of funds. Any conflicts between that order and the consent judgment of the North Carolina court can be mitigated through the use of stays pending final determination of the legal issues.[151] This is effectual relief, and I believe the equities weigh in favor of granting it.

IV. THE DEPARTMENT HAS NOT FULFILLED ITS LEGAL OBLIGATION

The District Court below improperly dismissed this action and thus did not reach the merits of the Department's settlement with the State of North Carolina. Were I writing for a majority, I would simply stop at this point and remand to the District Court for a determination of those merits. However, the United States Commission on Civil Rights has already reviewed this agreement and concluded that it miserably fails to meet the Department's own requirements for a satisfactory desegregation plan. See note 9 supra. Therefore, to prevent the forest of civil rights violations from being obscured by the procedural trees of this litigation, I will now demonstrate how manifest the Department's abdication of its legal responsibilities has been. First, in approving North Carolina's plan the Department abandoned its own desegregation criteria, implementation of which was judicial-ly mandated. Second, the Department approved a plan with the same basic infirmities as the 1974 Plan, which had already been judicially determined to be inadequate under the law.

A. Abandonment of the Desegregation Criteria

In promulgating desegregation criteria pursuant to the District Court's order, the Department found specific guidance in the prior opinions in the Adams litigation. See Adams v. Califano, supra, 430 F.Supp. at 120. Accordingly, the Amended Criteria provided numerous specific steps to be taken under three broad rubrics: I. Disestablishment of the Structure of the Dual System;[152] II. Desegregation of Student Enrollment;[153] and III. Desegregation of Faculty, Administrative Staffs, Non-Academic Personnel, and Governing Boards.[154]

A comparison of the North Carolina plan[155] with the Amended Criteria reveals innumerable, fundamental discrepancies. Several examples suffice to show a common pattern. For instance, Part I–C of the Criteria requires the state to "take specific steps to eliminate educationally unnecessary program duplication among traditionally black and traditionally white institutions in the same service area."[156] This requirement reflected the District Court's concern that "specific commitments" were necessary in the area of "duplication of program offerings among institutions."[157] This was a crucial area for reform because,

---

**151.** The District Court could stay any affirmative relief it might grant until the Secretary has had every reasonable opportunity to free himself—either through appeal of the District Court's order to this court and the Supreme Court, or through petition for withdrawal from the consent decree to the North Carolina court and the courts that review it—from any inconsistent obligations the order might impose. This is the traditional manner by which courts avoid inconsistent judgments. See Robertson v. Dep't of Defense, supra note 129, 402 F.Supp. at 1346; see also Hale v. Bimco Trading, Inc., 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939). Affirmative relief, with appropriate stays, forces the Secretary to vindicate himself in the courts or to grant appellants the relief they seek. This is the only avenue I see

by which the District Court can avoid issuing an inconsistent judicial mandate and still enforce the law as Congress has written it.

**152.** Amended Criteria, 42 Fed.Reg. at 40782–40783, App. 104–105.

**153.** Id. at 40783–40784, App. 105–106.

**154.** Id. at 40784, App. 106.

**155.** Consent Decree, App. 32.

**156.** Amended Criteria, 42 Fed.Reg. at 40783, App. 105 (emphasis deleted).

**157.** Adams v. Califano, supra note 5, 430 F.Supp. at 120.

as the Department had explained to North Carolina's counsel late in 1979, "program duplication is the most obvious vestige of past state-sanctioned segregation, and modifying the structure of non-core duplicated programs is the least intrusive, least disruptive method which would promise to eliminate the vestiges of discrimination in the UNC system." [158] Nonetheless, the new state plan approved by the Department is *totally silent* on the subject of program duplication. [159]

Part II–C of the Criteria requires each state plan to adopt the goal that "the proportion of black state residents who graduate from undergraduate institutions in the state system and enter graduate study or professional schools in the state system shall be at least equal to the proportion of white state residents who graduate from undergraduate institutions in the state system and enter such schools." [160] This criterion responded to a specific concern expressed by this court *en banc* concerning the "lack of state-wide planning to provide more and better trained minority group * * professionals." [161] Yet the new state plan approved by the Department does not even mention, let alone adopt, this goal.

Similarly, Part II–E of the Criteria mandated a commitment to take all reasonable steps to reduce the disparity between the proportion of black and white students graduating from public institutions of higher education. [162] This requirement was directly in line with the District Court's finding that specific commitments were necessary so that students could be retained. [163] Once again, the new state plan ignores the requirement. As for admission of students, also mentioned by the District Court, [164] states were required to adopt the goal that the proportion of black high school graduates who enter public higher education equal the proportion of white high school graduates who do so. [165] The new plan does little more than document the existing disparity: 20.5 percent of all black high school graduates entering university institutions as opposed to 25.5 percent of white high school graduates. [166]

Part III of the Criteria identified a number of specific measures to be taken to assure desegregation of faculty and nonacademic employees. [167] The new state plan, however, fails to respond to any of the requirements identified in the Criteria; instead, the plan merely incorporates each constituent institution's individual affirmative action plan. [168] This approach does not comport with this court's guidance that "[t]he problem of integrating higher education must be dealt with on a state-wide rather than a school-by-school basis." [169] Moreover, the inadequacies of the existing affirmative action plans had already been explained in some detail by the Department itself. [170] For instance, under the existing affirmative action programs the faculties of

---

158. Letter, *supra* note 39, at 3, App. 113. By consolidating identical programs at neighboring schools into a single school, the result should be a larger and stronger program more likely to attract students of all races.

159. This plan actually represents a step backward. In 1978 the UNC Board of Governors had committed itself to reduce program duplication, although the University subsequently renounced this goal. *See* Letter, *supra* note 39, at 3, App. 113.

160. *Amended Criteria,* 42 Fed.Reg. at 40783, App. 105 (emphasis deleted).

161. *Adams v. Richardson, supra* note 6, 480 F.2d at 1165. *See Amended Criteria,* 42 Fed. Reg. at 40783, App. 105.

162. *Id.* at 40784, App. 106.

163. *Adams v. Califano, supra* note 5, 430 F.Supp. at 120.

164. *Id.*

165. Part II–A of *Amended Criteria,* 42 Fed.Reg. at 40783, App. 105.

166. Consent Decree, Appendix I at 1, App. 69.

167. *Amended Criteria,* 42 Fed.Reg. at 40784, App. 106.

168. Consent Decree at 22, App. 55.

169. *Adams v. Richardson, supra* note 6, 480 F.2d at 1164.

170. *See* Letter, *supra* note 39, at 5, App. 115.

the traditionally white institutions in the UNC system will be no more than three percent black by 1985.[171] Yet the Department has already indicated that "[u]ntil there are substantial numbers of black faculty and administrators at the [traditionally white institutions], those institutions will continue to have difficulty attracting and keeping black students, and will retain their historic racial identity." [172]

Overall, of the 25 specific requirements identified in the *Amended Criteria,* the North Carolina plan approved by the Department incorporates *none.*[173] At most, the plan responds weakly to some of the general concerns underlying the Criteria, but a comparison of the plan with the Criteria demonstrates a failure to comply with any specific mandates. Actually, the record shows that HEW did endeavor to apply the criteria during the negotiations that took place shortly after the Second Supplemental Order and during 1979.[174] However, as the above examples indicate, the Department suddenly reversed its prior disapproval of North Carolina's proposals and abandoned the Criteria in 1981 when it approved the North Carolina plan.

The government does not appear to deny the existence of significant divergences between the Criteria and the approved plan. Rather, the government's argument is one of avowal and justification. To begin with, the government argues that the Criteria are not "immutable standards" but rather are guidelines that can be flexibly adjusted as part of a settlement process.[175] But this is not a case where the guidelines were merely adjusted. Rather, the Department virtually discarded the Criteria in the proposed agreement. The District Court had ordered promulgation of "certain specific requirements which the states *must* respond to" [176] in formulating their desegregation plans. The Criteria described the requirements for states to meet their "statutory obligation to devise and implement plans that are effective in achieving the desegregation of the system." [177] Furthermore, the Criteria were developed with the unique needs and circumstances of each of the relevant states in mind.[178] Indeed, the Department had stated in 1977 that "[e]ach plan shall commit the state to *substantial progress* toward *each* of the goals in the first two years of the plan." [179] Under these circumstances, the Department can hardly waive application of the Criteria. Indeed, if the Department is now allowed to ignore the Criteria, then we have reverted to a situation where

**171.** *Id.*

**172.** *Id.*

**173.** *See* brief of plaintiffs-appellants at 28 (tabular analysis of compliance).

**174.** Correspondence between counsel for the government and North Carolina during 1971 illustrates this fact. *See* App. 108–118.

**175.** Brief for appellees at 32–34. Although the Criteria do not specify, in detail, the requirements of an acceptable desegregation plan, they do create the general framework within which an acceptable voluntary compliance plan can be drawn. The government had earlier conceded as much: "It is those criteria against which HEW must measure acceptable plans * * *." Motion of Federal Defendants to Transfer This Action to United States District Court for the District of Columbia, *cited* in supplemental brief of plaintiffs-appellants at 12. It is within this framework that the Department and the state can negotiate over the

specific plans that will bring the state into compliance with Title VI.

Thus, though the criteria were designed to allow for negotiation and compromise, they establish, by rule, certain minimum qualities that an acceptable plan must have. These rules have the full force and effect of law. *See* notes 60 & 78 *supra.* They cannot be abandoned or bartered away. The government carries a burden of demonstrating why certain guidelines do not apply. A reviewing court will scrutinize both the plan and these explanations to ensure that the Department has not acted arbitrarily or capriciously. *See* note 59 *supra.*

**176.** Transcript of January 17, 1977 Hearing at 25 (emphasis added).

**177.** *Amended Criteria,* 42 Fed.Reg. at 40781, App. 103.

**178.** *See* notes 33–34 *supra* and accompanying text.

**179.** *Amended Criteria,* 42 Fed.Reg. at 40784, App. 106 (emphasis added).

the Department is in effect acting without any public guidelines, a situation specifically prohibited by prior court orders.[180]

The government also argues against application of the Criteria because "there has been substantial progress in North Carolina since this litigation was commenced back in 1970."[181] This argument makes little sense. If progress had truly been achieved, it should be *easier* to secure compliance with the Criteria and the requirements should not be loosened. Moreover, available evidence hardly supports assertions of substantial progress. Consider merely one prominent indicator of progress. In 1972 enrollments in the five traditionally black institutions in the University of North Carolina system were 95 percent black; in 1980 these student bodies were still 98 percent black.[182] The eleven traditionally white institutions with student bodies that were 97 percent white in 1972 were still 93 percent white in 1980.[183] In any event, the government's reference to progress made since *1970* has little meaning since the Criteria were formulated in *1977* and presumably accounted for progress made by that date.

B. *Failure to Correct Deficiencies of the Prior Plan*

In the proposed agreement the Department has also approved a plan that contains the same basic infirmities as a plan that the District Court determined to be inadequate over five years ago. Indeed, the new plan is in many ways even weaker than North Carolina's 1974 Plan. As noted earlier,[184] HEW had initially accepted the 1974 Plan,

but in 1977 the District Court ordered the Department to revoke its approval of that plan.

A comparison of North Carolina's new plan [185] with the 1974 Plan [186] demonstrates little in the way of substantive improvement. In particular, the plans can be analyzed in the four key areas which the District Court specifically identified in 1977 when it ordered the Department to revoke its approval: [187]

—desegregation of student bodies;
—desegregation of faculties;
—desegregation of program duplication;
—enhancement of black institutions.

1. *Desegregation of student bodies.*

The new plan proposes a large number of informational and recruiting activities to increase the presence of blacks at traditionally white institutions and of whites at traditionally black institutions.[188] The 1974 Plan also proposed a large number of such activities,[189] some of which are precisely the same as those included in the proposed agreement.[190] The goal of such efforts is to increase the presence of whites and blacks at traditionally black and white institutions, respectively. Along these lines, both plans set specific numerical goals for student enrollments.

Amazingly, however, desegregation of student bodies under the new plan would actually proceed at a *slower* rate than that projected in the 1974 Plan. Indeed, progress under the new plan would occur at

**180.** *See* notes 29–32 *supra* and accompanying text.

**181.** Brief for appellees at 34.

**182.** *See* Consent Decree, Appendix II, Table 8, App. 97–98.

**183.** *See id.*

**184.** *See* text at notes 20–25 *supra.*

**185.** Consent Decree, App. 32.

**186.** 1974 Plan, *supra* note 23.

**187.** *Adams v. Califano, supra* note 5, 430 F.Supp. at 120. A fifth area identified by the District Court, "desegregation of the governance of higher education system," *id.,* does not appear to receive any attention in either plan.

**188.** Consent Decree at 9–21, App. 42–54.

**189.** 1974 Plan, *supra* note 23, at 120–134.

**190.** *Compare, e.g., id.* at 124–125 (descriptions of two new brochures each to contain statement on policy of nondiscrimination) *with* Consent Decree at 10, App. 43 (description of the same two brochures with each containing a discussion of nondiscrimination policies).

a slower rate than that experienced over the past eight years, a time during which *no* approved plan has existed. Specifically, for 1980 to 1986 the proposed agreement establishes the following goals: [191]

| | Average Annual Increase |
|---|---|
| Percentage of Whites Enrolled at Traditionally Black Institutions | + 0.633% |
| Percentage of Blacks Enrolled at Traditionally White Institutions | + 0.533% |

By contrast, the 1974 Plan had established the following goals for increasing the presence of underrepresented groups during the final 1976–1977 period: [192]

| | Annual Increase (1976–1977) |
|---|---|
| Percentage of Whites Enrolled at Traditionally Black Institutions | + 1.5% |
| Percentage of Blacks Enrolled at Traditionally White Institutions | + 0.6% |

Thus during the most comparable time frames the 1974 Plan set much more ambitious goals for desegregation of student bodies than does the proposed new plan. Also, progress under the new plan will actually come at a slower pace than that experienced during the past eight years, when *no* approved plan existed. This conclusion is evident from the following table.[193]

| | Average Annual Increase | |
|---|---|---|
| | Historical 1972–1980 | Planned 1980–1986 |
| Percentage of Whites Enrolled at Traditionally Black Institutions | + 0.775% | + 0.633% |
| Percentage of Blacks Enrolled at Traditionally White Institutions | + 0.537% | + 0.533% |

### 2. Desegregation of faculties.

The desegregation of faculties was a second area in which the District Court found the 1974 Plan lacking. The proposed agreement merely incorporates "[e]ach constituent institution's affirmative action plan" [194] submitted under Executive Order No. 11246. *No* other action is contemplated. The 1974 Plan also adopted each constituent institution's affirmative action plan.[195] But in addition the earlier plan proposed a series of supplemental efforts designed to support the separate institutional commitments.[196] While the proposals were otherwise identical, the 1974 Plan was to this extent even less objectionable than. the new plan.

### 3. Reduction of program duplication.

The 1974 Plan did not propose any specific steps toward elimination of educationally unnecessary program duplication among black and white institutions in the same service area. However, the State then at least expressed a willingness to identify and eliminate "instances of unnecessary and costly duplication of programs within the University, taking into account the educational needs of the whole State." [197] The commitment was a qualified and cautious one. Nonetheless, even this modest commitment in the 1974 Plan is missing from the new agreement, which is totally silent on the entire problem of duplicative programs.[198]

191. Consent Decree at 21–22, App. 54–55.

192. 1974 Plan, *supra* note 23, at 265. The 1974 Plan actually set goals for the 1973–74 time frame, but the annual increase was not supposed to be constant over time. "[T]he rate will gradually augment over the time frame, with greater accomplishment to be realized in 1977 than in 1974." *Id.* at 264. The figures used in text are thus for the 1974 Plan as fully implemented. These figures are the most comparable with those given for the new plan, since the time frames (1976–1977 *versus* 1980–1986) are the most proximate.

Even if the average annual increase for the entire 1973–1977 period is compared to that for the 1980–1986 period, the 1974 Plan compares favorably. The average annual increase for whites at traditionally black institutions is substantially larger in the 1974 Plan (1.3% *versus* 0.633% in the new plan), while the average annual increase for blacks at traditionally white institutions is only slightly lower in the 1974 Plan (0.35% *versus* 0.533% in the new plan).

193. *See* Consent Decree, Appendix II, Table 8, App. 97–98 (historical data).

194. Consent Decree at 22, App. 55.

195. 1974 Plan, *supra* note 23, at 161.

196. *Id.* at 164–178.

197. *Id.* at 228.

198. *See* notes 156–159 *supra* and accompanying text.

#### 4. Enhancement of black institutions.

With respect to efforts to strengthen the five traditionally black institutions in the UNC system, the new plan does appear to offer greater promise than the 1974 Plan. To this extent the new plan is not so infirm as the 1974 proposal. However, the nine-part program outlined in the proposed agreement has deceptively little substance.[199] Moreover, the Department had criticized the same sorts of commitments in 1979 because they failed to provide the traditionally black institutions "with facilities, programs, degree offerings and faculty comparable to traditionally white institutions with similar missions."[200] Indeed, the new commitments appear to represent substantially less than those previously offered by the University but deemed inadequate by the Department.[201] Nowhere has the Department explained its reassessment of the University's proposal in this area.

To the extent that the new plan may provide limited progress toward enhancing the traditionally black institutions, serious problems remain. For the mere pursuit of improved institutions with predominantly black enrollments represents nothing more than a policy of "separate but equal" with an emphasis on equality. Such a plan, particularly when compared to the 1974 Plan, cannot survive judicial review—at least not since 1954. *See Brown v. Board of Educa-*tion, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

In sum, it is exceedingly apparent to me that the Department has abandoned the desegregation criteria, without rational explanation, in entering into the North Carolina settlement. The Department has thus acted arbitrarily, capriciously, and without the authority of law. *See* 5 U.S.C. § 706(2)(A) (1976). The record in this case makes such a conclusion unavoidable.

### V. CONCLUSION

Title VI was enacted on the proposition that it was contrary to the "moral sense of the Nation" to expend federal funds on programs discriminating on the basis of race.[202] Congress was aware that most agencies dispensing federal funds had the "authority to * * * terminate assistance for failure to comply with * * * requirements imposed by statute or by administrative action," but plainly was dissatisfied with these agencies' efforts to ensure the nondiscriminatory use of federal funds.[203] Hence it enacted Title VI, which affirmatively required the agencies to end the discriminatory use of federal funds and furnished a mandatory procedure for the agencies to follow in doing so. Thus Section 601 states the federal policy on nondiscrimination, Section 602 provides the procedures the agencies must follow in implementing that

---

**199.** Six of the nine "commitments" are merely to maintain existing funding or other ratios, which either provide for parity or are favorable to the traditionally black institutions. Consent Decree at 23–25, App. 56–58 (Commitments 1, 2, 3, 5, 6, 7). As such, the plan represents little that is new. For example, the average teaching salary for traditionally black institutions is now at parity with that for the traditionally white institutions. Commitment 3 provides: "The University shall maintain this parity * * *." *Id.* at 24, App. 57. Such commitments do little more than protect against a reversion to blatantly discriminatory policies. A seventh commitment relating to financial support for libraries has even less content. *Id.* at 24, App. 57 (Commitment 4). It states that the University "shall consider carefully any institutional request for funds to address particularized library needs." *Id.* at 24–25, App. 57–58. Presumably the University already performs this function; the commitment hardly appears destined to improve the traditionally black institu-tions. The remaining commitments refer to programs already approved or in planning. *Id.* at 26–32. App. 59–65 (Commitments 8 and 9). These commitments signify nothing new.

**200.** Letter, *supra* note 37, at 2, App. 109. *See also* Letter, *supra* note 39, at 2, App. 112 ("grave doubts persist about the adequacy" of the University's efforts).

**201.** *Compare* Consent Decree at 10, App. 78 (*$40 million* in special supplemental appropriations allocated for predominantly black institutions), *with* Letter, *supra* note 37, at 2, App. 109 ("new" proposal to spend *$70 million* is neither new nor adequate).

**202.** 110 Cong.Rec. 6544 (1964) (remark of Sen. Humphrey).

**203.** *Id.* at 6546.

policy, and Section 603 authorizes aggrieved persons to obtain judicial review of agency action that becomes final. The *narrow*, but critical, question before this court is whether Section 603, *via* the APA, authorizes judicial review of final Department action taken subsequent to the initiation of formal enforcement proceedings, or whether such action is precluded in favor of a judicially implied suit against the fund recipient. Under my understanding of separation of powers principles, this issue must be decided the way Congress has resolved it: in favor of a direct APA action against the Department. But today's decision repeals Section 603 and substitutes the court's own vision of the ideal enforcement scheme in its place.

The court rationalizes this unjustified intrusion on the legislative prerogative by resort to a set of procedurally-based constructs that are wholly foreign to our accepted scheme of procedural justice. Our procedural rules are tuned to reach a necessarily rough, but satisfactory, long-run accommodation of two competing jurisprudential policies: finality and correctness. Finality is the notion that all litigation must have an end, and thus militates forcibly against renewed exploration of previously litigated matters. Correctness is the notion that adjudication should produce accurate and fair results, and thus allows judgments to be reopened and issues reexamined. These two policies are at tension in every case. Rules concerning venue, transfer, intervention, joinder, estoppel, and indispensable parties are designed to achieve a delicate balance between policies of finality and correctness. Properly applied, they ensure that willing parties can participate in litigation that affects their interests and that courts can reach the merits of cases presented to them. The court's application of these procedural principles produces the opposite result: It precludes the District Court and the parties before it from litigating the merits. The court's procedurally-based constructs favor finality concerns to the exclusion of any concern for correctness. In my judgment, this approach works a manifest procedural injus-

tice and the court's manipulation of these procedural principles will come back to haunt it in the future.

Moreover, the injustice resulting from this case will not simply be procedural. Substantively, today's decision will help those who oppose the civil rights laws to reduce Title VI and other federal statutes like it—most particularly, the identical Title IX provisions proscribing gender discrimination—to mere chimeras of what Congress intended them to be. By rewriting the judicial review provisions of Title VI and by recalibrating our rules of procedure, the court initiates the process by which discriminatory institutions can dilute the nondiscrimination policies expressed in Title VI and other civil rights statutes. This case demonstrates that the Department can still distribute funds to institutions allegedly operating in a racially discriminatory manner. Allowing the Department to abandon its own desegregation criteria in this case undercuts the credibility of Title VI enforcement efforts in all the other states. Similarly, committing Department compliance decisions to the unreviewable discretion of the agency removes an essential check on bureaucratic arbitrariness. Finally, allowing the Department and North Carolina to evade the statute's instructions on choice of forum encourages the other states to do the same. The court's decision opens the floodgates through which the Department and recalcitrant states can water down Title VI's (and other civil rights acts') moral and legal imperative. This dilution makes a mockery of Congress' and our nation's moral sense that racial (and sexual) equality must begin in the schools where our children are educated. Thus today's decision works a yet untold substantive injustice.

Accordingly, I dissent.

WALD and MIKVA, Circuit Judges, dissenting:

We concur with Parts I–III and V of Judge Wright's dissenting opinion, although we would leave the initial determination of the conformity of the North Carolina agree-

ment to the *Amended Criteria* and Title VI to the district court.